# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 34639

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | Pocatello, September 2010 Term |
| | ) | |
|     Plaintiff-Respondent, | ) | 2012 Opinion No. 23 |
| | ) | |
| v. | ) | Filed: January 25, 2012 |
| | ) | |
| TOREY MICHAEL ADAMCIK, | ) | Stephen W. Kenyon, Clerk |
| | ) | |
|     Defendant-Appellant. | ) | SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION DATED NOVEMBER 29, 2011 IS HEREBY WITHDRAWN |
| | ) | |
| | ) | |
| | ) | |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Bannock County. Honorable Peter D. McDermott, District Judge.

Judgment of conviction for first-degree murder and conspiracy to commit first-degree murder is <u>affirmed.</u>

Nevin, Benjamin, McKay & Bartlett, Boise, for appellant. Dennis A. Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. John C. McKinney, Deputy Attorney General argued.

_____

J. JONES, Justice.

Torey Michael Adamcik (Adamcik) appeals from his convictions for first-degree murder and conspiracy to commit first-degree murder. Adamcik raises the following issues on appeal: (1) whether there was constitutionally sufficient evidence for a jury to find beyond a reasonable doubt that Adamcik stabbed the victim, Cassie Jo Stoddart (Stoddart), causing her death; (2) whether the district court erred in denying Adamcik's motion to suppress statements he made while in custody; (3) whether the jury was properly instructed; (4) whether the State committed fundamental error in its closing argument; (5) whether the cumulative error doctrine necessitates a reversal; (6) whether the district court abused its discretion in sentencing Adamcik; and (7) whether the sentences imposed are unreasonable, or cruel and unusual, due to Adamcik's status

1

as a minor at the time the crimes occurred. Adamcik also appeals the district court's denial of his post-trial motion for reduction in sentence pursuant to Idaho Criminal Rule 35. We affirm.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

On June 8, 2007, a jury convicted Adamcik for the first-degree murder of Cassie Jo Stoddart and for entering into a conspiracy with his co-defendant Brian Draper (Draper) to commit first-degree murder. Subsequently, Adamcik was sentenced to indeterminate life with thirty years fixed for conspiracy to commit first-degree murder and fixed life for first-degree murder.

On September 22, 2006, Stoddart was spending the night at her cousin's house, the Whispering Cliffs residence, performing house-sitting duties. Matt Beckham (Beckham), Stoddart's boyfriend, stated that he and Stoddart had invited Adamcik to the Whispering Cliffs residence that evening to "hang out." Adamcik and Draper arrived at the Whispering Cliffs residence at approximately 6:30 or 7:00 PM. After spending approximately two hours at the Whispering Cliffs residence, Draper informed Stoddart and Beckham that he needed to leave and shortly thereafter Draper and Adamcik departed.

Approximately fifteen minutes after Adamcik and Draper departed, the power at the Whispering Cliffs residence went out. Beckham called his mother to ask for permission to stay the night, but such permission was denied. After speaking with his mother, Beckham phoned Adamcik to inform him that Beckham would be going home for the night. Beckham later said that during their conversation Adamcik spoke in a whisper and claimed to be at a movie. Beckham and Adamcik spent the following day together. Beckham tried repeatedly to call Stoddart throughout the day but was unable to get an answer.

On September 24, 2006, it was discovered that Stoddart had been killed at the Whispering Cliffs residence. Police officer Hatch responded to the scene and noted large amounts of blood on the victim's body, as well as deep lacerations and stab wounds. Shortly after responding, police and paramedics confirmed that Stoddart was dead. Detectives conducting the preliminary investigation determined that Adamcik and Draper had been among the last people to see Stoddart alive.

Detectives Thomas and Ganske went to the Adamcik home and interviewed Adamcik on September 24, 2006. Adamcik's father, Sean Adamcik (Sean), was present. This interview was

the first of two interviews that detectives Thomas and Ganske conducted with Adamcik. During the course of the first interview, Adamcik informed the detectives that he and Draper had gone to the Whispering Cliffs residence at approximately 8:30 PM on September 22, 2006, for a party. Adamcik stated that when it became apparent that a party was not going to take place, he and Draper decided to go and see a movie in Pocatello. When the detectives questioned Adamcik regarding the movie he had reportedly seen, Adamcik was unable to describe what the movie had been about. Adamcik told detectives that following the movie he and Draper had gone to spend the night at Adamcik's home.

On September 27, 2006, after Adamcik's first interview, but before the second, Draper led law enforcement agents to a stash of evidence buried in the Black Rock Canyon area (BRC site). The evidence uncovered by law enforcement at the BRC site included:

1. Two dagger-style knives with sheaths.

2. A silver-and-black-handled knife with a smooth and non-serrated blade.

3. A folding knife with a silver blade and black handle, which is similar to a survival knife. The portion of the blade nearest to the hilt is serrated.

4. A homemade Sony videotape (BRC tape).

5. A box of stick matches.

6. A melted brown bottle of hydrogen peroxide.

7. Partially burned notebook paper.

8. A partially melted multi-colored mask.

9. A red and white mask.

10. A pair of black boots.

11. A single black glove.

12. A pair of black "Puma" gloves.

13. A pair of blue latex gloves.

14. A pair of fingerless black "Athletic Works" gloves.

15. A black "Calvin Klein" dress shirt.

16. A black "Hagger" shirt.

Adamcik conceded that his handwriting was present on the notebook paper found along with the other evidence at the BRC site. The BRC tape contained footage of Adamcik and Draper planning Stoddart's murder, and later reacting to having killed Stoddart. The BRC tape

skips around and is not recorded in chronological order. The following relevant portions of the BRC tape have been rearranged according to the time and date stamps that appear on the BRC tape.[1]

1. <u>September 21, 2006, at 8:05:23 PM</u>  [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]
**Draper:**  We're going for a high death count
**Adamcik**:  Plus, we're not going to get caught Brian, if we're going for guns, we're just gonna end it.  We're just gonna grab the guns and get outta there and kill everybody and leave.
**Draper**:  We're going to make history. . . . We're gonna make history.
**Adamcik**:  For all you FBI agents watching this—
**Draper**:  (laughing)
**Adamcik**:  Uh . . . you weren't quick enough. (laughing)
**Draper**:  You weren't quick enough, and you weren't s-s-smart enough.  And we're going over to [Jane Doe 1's] house, we-we-we're going to snoop around over there and try to see if she's home alone or not, and if she's home alone, SPLAT! . . . She dead.
**Adamcik**:  Don't put your humor into this Brian.
**Draper**:  Uh, I'm not putting any humor into it. . . . Yep, people will die, and m-m-memories will fade.
**Adamcik**:  Memories will fade. . . . I, hmm, I wonder what movie you got that from Brian?
**Draper**:  Myself!
**Adamcik**:  (laughing)
**Draper**:  That was from myself.
**Adamcik**:  No wonder it was so lame.
**Draper**:—kay, we're on our way, and I'm gonna, I'll let you stay tuned, we're almost there.

2. <u>September 21, 2006, at 8:08:12 PM</u>  [Adamcik and Draper are in a car, Draper is filming Adamcik with the camera light on]
**Draper**:  We're at [Jane Doe 1's] house. It's clear out there in the pasture.  We've already snooped around her house a couple times, Uh, and sh-sh-she's not at home so we're gonna go to that church over there and we're gonna call a girl and a guy named Cassie and Matt.  They're our-our friends but we have to make sacrifices.  So um I feel tonight i-i-it is the night and I feel really weird . . . and stuff.  I feel like I want to kill somebody.  Uh, I know that's not normal but what the hell.
**Adamcik**:  I feel we need to break away from normal life.
**Draper**:  How bright is this light? [Draper has turned the camera light directly onto Adamcik]
**Adamcik**:  Because . . . let's put it this way . . . parents, along with their parents, along with their parents, and so on—
**Draper**:  Uh-huh
**Adamcik**:—taught them about God, Jesus, the whole bullshit—
**Draper**:  (laughing)

---

[1] Where the names of uninvolved third-parties are used by Draper and Adamcik these have been altered to protect the identity of these individuals.  The entire video has not been transcribed here.

**Adamcik**: —line. I'm sure you guys believe in God as well. I realized when I was in seventh grade . . . along, you don't believe in Santa Claus or—
**Draper**: (laughing)
**Adamcik**:—vampires, or werewolves, they're used to metaphor, not let—they teach their kids back in the 1800s, I learned this in English class, about telling their kids that they can't go outside or a vampire will get you—just to make their kids stay and do what they want to do. God is basically—
**Draper**: That's what God's for right?
**Adamcik**:—the same way—
**Draper**: Yep.
**Adamcik**:—tryin' to get people to do good, or else "so-called" [air quoting] you go to hell.
**Draper**: And we're obviously going to hell if it's real, but who gives a shit?
**Adamcik**: And why would you say it's real?
**Draper**: [talking over Adamcik] Yeah, but it's not real. It's not real, cuz it's so blatantly obvious that it's not real, but (laughing)
**Adamcik**: People believe it because their parents teach them, and so it's so hard for them to let go of it because they've been taught their whole life.
**Draper**: Yeah, I know.
**Adamcik**: But, fuckin—
**Draper**: What?
**Adamcik**:—the point I'm makin' is . . . we are also taught that things like killing people and other things is wrong. The only thing that is wrong about is because it's breaking the law and the law is only wrong (mumbling, searching for words)—
**Draper**: Natural selection, dude. Natural selection, that's all I've gotta say.
**Adamcik**: There should be no law against killing people. I know it's a wrong thing, but . . .
**Draper**: Natural selection—
**Adamcik**:—Hell, hell, you restrict somebody from it, they're just gonna want it more.
**Draper**: Exactly. Goodbye camera.

3. <u>September 21, 2006, at 8:15:39 PM</u> [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]
**Draper**:—home. My friend's too pussy to go investigate—turn here
**Adamcik**: Too smart—
**Draper**: Why aren't you turning there dude?
**Adamcik**: Cuz it's faster this way
**Draper**: Now we're going to go over to Cassie and Matt's house. If they're home alone, we're gonna…
**Adamcik**: It's Cassie's house. Matt is there.
**Draper**: Matt is there. Sorry. We're gonna ga—we're gonna knock on the door. We'll see who is there. We'll, we'll see, we'll see-see if their parents are home or not. If they're home alone we will leave our way and then we will come back in about ten minutes. We'll sneak in through the door because chances are they're probably in Cassie's room. S-s-s-so we will sneak in the front door, we'll make a noise outside.
**Adamcik**: And Matt will come out to investigate.
**Draper**: We'll kill him. And we'll scare the shit out of Cassie . . . okay?
**Adamcik**: Sounds like fun.

**Draper**: Well stay tuned.

4. <u>September 21, 2006, at 8:36:46 PM</u>  [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]
**Draper**: We found our victim and sad as it may be she's our friend but you know what? We all have to make sacrifices. Our first victim is going to be Cassie Stoddart and her friends . . .
**Adamcik**: [directed at passing car] God, turn your brights off asshole!
**Draper**: We'll let you . . . (laughs) we'll find out if she has friends over, if she's going to be alone in a big dark house out in the middle of nowhere (laughs). How perfect can you get? I, I mean like holy shit dude.
**Adamcik**: I'm horny just thinking about it.
**Draper**: Hell yeah. So we're gonna fuckin' kill her and her friends and we're gonna keep moving on. I heard some news about [Jane Doe 2], she's gonna be home alone from six to seven so we might kill her and drive over to Cassie's thing and scare the shit out of them and kill them one by fucking one. Hell yeah.
**Adamcik**: Why one by one? Why can't it be a slaughterhouse?
**Draper**: Two by two and three by three. Cause we've got to keep it classy.
**Adamcik**: Keep it classy.
**Draper**: So yeah. It's going to be extra fun.
**Adamcik**: You're evil (laughs).
**Draper**: Yes, I am. So are you dude. Evil. Evil.
**Adamcik**: No. Evil is an expression of God. That was another test you failed.
**Draper**: Evil is not an expression of God.
**Adamcik**: Yes, it is.
**Draper**: That is bullshit and you know it.
**Adamcik**: Evil of origin is a follower of fucking Satan.
**Draper**: There is no Satan.
**Adamcik**: Is Satan real? Then shut up.
**Draper**: Then how are we supposed to express ourselves?
**Adamcik**: Good and Bad.
**Draper**: We're, we're bad.
**Adamcik**: We are bad.
**Draper**: That sounds so shitty.
**Adamcik**: We're evil. That sounds even shittier.
**Draper**: Hey, we're not, okay. Then we are sick psychopaths who get their pleasure off killing other people.
**Adamcik**: That sounds good baby.
**Draper**: We're gonna go down in history. We're gonna be just like Scream except real life terms.
**Adamcik**: That sounds good baby.
**Draper**: We're gonna be murderers. Like, let's see, Ted Bundy, like the Hillside Strangler.
**Adamcik**: No.
**Draper**: The Zodiac Killer.
**Adamcik**: Those people were more amateurs compared to what we are going to be, we're gonna be more of higher sources of Ed gl . . .
**Draper**: Gein

**Adamcik**:  Gein
**Draper**: (laughs)  Well let's say we're that sick and that twisted—
**Adamcik**:  Oh, you know what Ed Gein's words were?
**Draper**:  What?
**Adamcik**:  He saw a girl walkin' down the street, right?
**Draper**:  Yeah.
**Adamcik**:  Two questions came to his head.  Hmm, I could take her out and have a nice time with her—
**Draper**:—and then kill her?  Skin her alive?
**Adamcik**:—charm the pants off her.  Or, I wonder what her head would look like on a stick? (laughs)
**Draper**:  (laughs) Holy shit!
**Adamcik**:  It's creepy huh?
**Draper**:  Kick ass.
**Adamcik & Draper**:  (laughing)
**Draper**:  Murder is power, murder is freedom, goodbye.
**Adamcik**:  Umm—

5. September 22, 2006, at 12:10:58 PM [Adamcik and Draper are sitting at a table with the camera facing them]
**Draper**:  Alright, cool.
**Adamcik**:  [looking down and writing in a notebook] I was planning to kill him.
**Draper**:  September 22, 2006, we're skipping our fourth hour class.  We're writing our plan right now for tonight.  It's gonna be cool.
**Adamcik**:  We?  Torey and Brian . . . [writing] . . . we're making our death list right now, for when, for actually tonight . . .
**Draper**:  (whispering) she's watching us . . .
**Adamcik**:  (unintelligible)
**Draper**:  She's still watching us . . .
**Adamcik**:  (mumbling, unintelligible)
**Draper**:  [loudly] Number 2 is what?
[long gap where Adamcik and Draper are both concerned a teacher is going to see them, are whispering various things related to this and trying to make themselves less visible]
**Adamcik**:  [writing again]  Then . . . (unintelligible)
**Draper**:  Yeah, if you're watching this we're probably deceased
. . .
**Draper**:  Hopefully this will go smoothly and we can get our first kill done and then keep going.
**Adamcik**:  For you future serial killers watching this tape
**Adamcik & Draper**:  (laughing)
**Adamcik**:  I don't know what to say.
**Draper**:  It-It's—
**Adamcik**:—good luck with that.
**Draper**:  Good luck.
**Adamcik**:  Hopefully you don't have like 8 or 9 failures like we have.

**Draper**:  Yeah, we've probably tried maybe 10 times, but they've never been home alone so—

**Adamcik**:  Or when they have, their parents show up.

**Draper**:  As long as you're patient you know, and we were patient and now we're getting paid off, cuz our victim's home alone, so we got er, our plan all worked out now. . . .  I'm sorry.  I'm sorry Cassie's family, but she had to be the one.  We have to stick with the plan . . . and she's perfect, so she's gonna die (laughs)

. . .

6.  September 22, 2006, at 9:53:20 PM [It is dark and Draper and Adamcik are sitting in a car.]

**Draper**:  We're here in his car. The time is 9:50, September 22nd, 2006. Um . . . unfortunately we have the grueling task of killing our two friends and they are right in—in that house just down the street.

**Adamcik**:  We just talked to them.  We were there for an hour, but . . .

**Draper**:  We checked out the whole house.  We know there's lots of doors. There, there's lots of places to hide.  Um, I unlocked the back doors.  It's all unlocked.  Now we just got to wait and um . . . yep, we're, we're really nervous right now but, you know, we're ready.

**Adamcik**:  We're listening to the greatest rock band ever.

**Draper**:  We've waited for this for a long time.

**Adamcik**:  Pink Floyd.  Before we commit the ultimate crime of murder.

**Draper**:  We've waited for this for a long time.

**Adamcik**:  A long time.

**Draper**:  We—well stay tuned.

7.  September 22, 2006, at 11:31:56 PM  [Adamcik and Draper are in a car driving.]

**Draper**: —just killed Cassie!  We just left her house.  This is not a fucking joke.

**Adamcik**:  I'm shaking.

**Draper**:  I stabbed her in the throat, and I saw her lifeless body.
It just disappeared.  Dude, I just killed Cassie!

**Adamcik**:  Oh my God!

**Draper**:  Oh, oh fuck.  That felt like it wasn't even real.  I mean it went by so fast.

**Adamcik**:  Shut the fuck up.  We gotta get our act straight.

**Draper**:  It's okay.  Okay?  We—we'll just buy movie tickets now.

**Adamcik**:  Okay

**Draper**:  (Unintelligible)

**Adamcik**:  No.

**Draper**:  Okay.  Bye.

On September 27, 2006, after the BRC site evidence was found, detectives Ganske and Thomas conducted a second interview with Adamcik at the Pocatello Police Department in the presence of Adamcik's parents. Detective Ganske read Adamcik his *Miranda*[2] rights at the beginning of the interview and Adamcik signed a waiver-of-rights form. During the course of the interview, Adamcik informed detectives Ganske and Thomas that he and Draper had arrived at

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the Whispering Cliffs residence at 8:00 or 8:30, got a tour of the home, watched a portion of the film *Kill Bill Vol. 2*, departed from the Whispering Cliffs residence at approximately 10:00 PM, and began attempting to break into cars. Adamcik stated that during the course of their attempted burglaries he made multiple calls to Beckham and during the final call Beckham informed Adamcik that his mother was coming to get him from the Whispering Cliffs residence.

Adamcik stated that he and Draper returned to Adamcik's house at around 11:30 PM and did not leave for the remainder of the night. However, when Ganske informed Adamcik that witnesses had seen him at the convenience store, Common Cents, Adamcik stated that he and Draper had gone to the store so that Draper could buy matches for Draper's cigarettes. Adamcik eventually admitted that he and Draper had gone to Black Rock Canyon. At the close of Adamcik's second interview, the detectives informed Adamcik of the evidence that they had discovered at the BRC site and pressured Adamcik to tell the truth. Adamcik responded by asking "Can I talk to an attorney?" The detectives stopped questioning Adamcik immediately, and exited the room, allowing Adamcik and his father, Sean, to converse in private in a different room. Following this private meeting, Adamcik, Sean and the detectives reconvened in the interview room where detectives proceeded to tell Adamcik that he was going to be arrested and informed Adamcik of the evidence they had gathered. In response to intervening questions from Sean, Adamcik made both verbal and nonverbal replies.

At trial, the jury heard extensive forensic testimony documenting and analyzing Stoddart's wounds. The medical examiner, Dr. Steve Skoumal, performed the autopsy on Stoddart on September 25, 2006. Dr. Skoumal determined that the cause of Stoddart's death was stab wounds to the trunk. In all, Dr. Skoumal documented thirty knife-related wounds on Stoddart's body, twelve of which were potentially fatal. The State also had forensic pathologist Dr. Charles Garrison examine Stoddart's body. Dr. Garrison testified "It's my opinion that there were at least two knives used, one of which was a non-serrated blade, and one of which was a serrated blade." In general, the majority of the potentially fatal wounds that Dr. Skoumal listed were inflicted with the serrated blade, however, wound number 1, which struck the right ventricle of Stoddart's heart, was inflicted by a non-serrated blade—consistent with Dr. Garrison's testimony—and was potentially fatal.

On June 8, 2007, the jury found Adamcik guilty of both conspiracy to commit first-degree murder and first-degree murder. On September 26, 2007, Adamcik filed his notice of appeal with this Court.

## II.
## ISSUES ON APPEAL

1. Whether sufficient evidence was submitted to support the jury's verdict that Adamcik was guilty of first-degree murder beyond a reasonable doubt?

2. Whether Adamcik's Fifth and Sixth Amendment rights were violated by the district court's denial of Adamcik's motion to suppress statements he made to detectives after Adamcik's parents purportedly invoked Adamcik's right to counsel?

3. Whether the district court erred by giving Jury Instruction number twelve, providing that Adamcik could be found guilty of first-degree murder if he "engaged in conduct which caused the death" of Stoddart?

4. Whether the district court erred in failing to provide the jury with a unanimity instruction requiring the jury to find that Adamcik committed the same specific act that caused Stoddart's death?

5. Whether the jury instruction regarding malice was a misstatement of the law which lowered the State's burden of proof?

6. Whether the district court erred by instructing the jury on a lying-in-wait theory of first-degree murder after the State had abandoned that allegation?

7. Whether the prosecutor's closing argument amounted to fundamental error?

8. Whether the cumulative error doctrine necessitates a reversal?

9. Whether the district court abused its discretion in sentencing Adamcik?

10. Whether the sentences imposed on Adamcik were unreasonable or cruel and unusual under the Idaho Constitution?

11. Whether the district court abused its discretion in denying Adamcik's Rule 35 motion?

## III.
## ANALYSIS

**A. Sufficient evidence was submitted to support the jury's determination that Adamcik was guilty of first-degree murder, beyond a reasonable doubt.**

In this case, the State charged Adamcik as a perpetrator of first-degree murder. Adamick argues that the State did not produce sufficient evidence upon which a reasonable jury could conclude that he was guilty of first-degree murder because the State failed to prove that he actually inflicted a fatal stab wound. Adamcik argues: (1) that the State failed to prove which of the wounds were fatal, as the State's expert witness, Dr. Skoumal, only offered testimony that twelve of the wounds were "potentially fatal;" (2) that the State failed to present any evidence

tying him to either of the knives and, therefore, failed to prove that he inflicted a fatal stab wound;[3] and (3) that the expert testimony of his own forensic pathologist, Dr. Leis, negated the testimony of the State's expert forensic pathologist, Dr. Garrison.[4]

The State responds that the testimony and autopsy report offered by Dr. Skoumal reveal that one of the twelve potentially fatal wounds was inflicted by the non-serrated knife blade while the remaining eleven were made with a serrated blade. The State argues that Dr. Garrison established the use of two knives—one with a serrated blade and the other with a non-serrated blade. Therefore, the State argues that the cumulative evidence of both experts demonstrates that two knives caused potentially fatal wounds.

1. Standard of Review.

The Fourteenth Amendment of the United States Constitution guarantees the right to due process, and the U.S. Supreme Court has held that as a part of that due process, "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). The relevant inquiry is not whether this Court would find the defendant to be guilty beyond a reasonable doubt, but whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original).

Thus, when determining whether Adamcik's conviction as a perpetrator of first-degree murder should be upheld, the only inquiry for this Court is whether there is substantial evidence upon which a reasonable jury could have found that the State met its burden of proving the essential elements of first-degree murder beyond a reasonable doubt. *State v. Joslin*, 145 Idaho

---

[3] Although Adamcik concedes that Dr. Skoumal testified that one of the potentially fatal wounds (identified as wound number 1) may have been inflicted by the non-serrated knife, he argues that Dr. Skoumal's testimony does not constitute sufficient evidence. Additionally, Adamcik argues that Dr. Garrison did not specifically testify that wound number 1 was caused by the non-serrated knife.

[4] Dr. Garrison testified that wounds identified as wound number 2 and wound number 22 were caused by the same stab (one through the hand that also went into the trunk), and that the knife used in these wounds was serrated. Dr. Leis testified that it was actually wound number 1 that was inflicted at the same time as wound number 22, not wound number 2. Consequently, Adamcik argues that Dr. Garrison's own testimony establishes that wound number 1 must have been inflicted by a serrated knife. Although Dr. Leis' testimony sought to call into question that of Dr. Garrison, the inquiry is whether the State provided sufficient evidence to support the conviction. If such evidence was presented, the Court does not second-guess the jury by reweighing the evidence. *See State v. Porter*, 130 Idaho 772, 787, 948 P.2d 127, 142 (1997) ("This Court simply reviews the evidence presented at trial and will not reweigh the evidence."). Therefore, this analysis does not address Adamcik's argument that his own expert, Dr. Leis, contradicted Dr. Garrison's testimony.

75, 80, 175 P.3d 764, 769 (2007). In conducting this analysis, the Court is required to consider the evidence in the light most favorable to the State, and we do not substitute our judgment for that of the jury on issues of witness credibility, weight of the evidence, or reasonable inferences to be drawn from the evidence. *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007). Viewing the evidence in the light most favorable to the State, there is substantial evidence in the record to support Adamcik's conviction for first-degree murder.

> 2. There is sufficient evidence to support the jury's conviction of Adamcik for first-degree murder.

Contrary to Adamcik's argument, there is substantial evidence in the record upon which a jury could reasonably conclude, beyond a reasonable doubt, that Adamcik was guilty of first-degree murder. Dr. Skoumal, the medical examiner who performed the autopsy on Stoddart, testified that Stoddart died from *multiple* stab wounds to the trunk. Dr. Skoumal also testified that twelve of the thirty knife-related wounds on Stoddart's body had the potential to be fatal. Of those twelve, Dr. Skoumal was unable to identify the specific wounds that caused Stoddart's death, but it is clear from his testimony that she died as a result of more than one of those twelve stab wounds. According to Dr. Skoumal, one of those wounds, referred to as wound number 1;

> was located in Stoddart's mid, upper chest. . . .
>
> The tissues that it penetrated included the skin, muscle, soft tissue, right rib number three, the mediastinum—which is in the middle of the chest—the pericardial sac—which is the sac overlining the heart—the right ventricle—which is a part of the heart. And there were two cups of blood in the pericardial sac surrounding the heart.
>
> It's my opinion that the vital structures were injured, and it had the potential to be fatal.

In response to a subsequent question from the prosecutor, as to whether wound number 1 was "potentially fatal," Dr. Skoumal answered in the affirmative.

Dr. Garrison testified that at least two knives were used in the murder of Stoddart, one with a serrated blade, and another with a non-serrated blade. Dr. Garrison based this conclusion on the fact that some of the wounds contained excoriations and tears around their edges, which is consistent with the use of a knife with a serrated blade, while other wounds contained no such excoriations or tears, which is consistent with the use of a knife with a non-serrated blade. Dr. Garrison further testified that wound number 1 did not contain any irregular cuts, which would

be expected if wound number 1 was inflicted by a knife with a non-serrated blade. From the testimony of these two witnesses, taken together, a reasonable jury could conclude that wound number 1, which was a potentially fatal wound, was inflicted by a knife with a non-serrated blade. Therefore, the jury could have reasonably concluded that two knives were used during the attack on Stoddart, and that both knives inflicted wounds that could have caused Stoddart's death.[5]

Adamcik's friend, Joe Lucero, testified that he bought four knives for Adamcik and Draper. Lucero said that he used $45 to pay for the knives—$40 from Draper and $5 from Adamcik. Lucero identified four of the State's exhibits as the knives he bought. One of the knives had a serrated blade; the other three knives were non-serrated. Police found all four knives at the BRC site. Lucero testified that Draper made a point to claim ownership of the serrated knife.

The jury was presented with evidence that two knives inflicted potentially fatal wounds, and that Adamcik and Draper collaborated in the murder. This collaboration is supported by the BRC tape wherein Draper and Adamcik discuss their joint plan to kill Stoddart. The jury was also provided with evidence suggesting that Adamcik and Draper were together immediately after Stoddart's murder, and jointly attempted to hide weapons and clothing used during the commission of the murder. The jury watched the video of police interviewing Adamcik, during which Adamcik made verbal and nonverbal assertions that can reasonably be construed as his confessing to stabbing Stoddart. This evidence, coupled with the testimony provided by the State's experts, is sufficient for a reasonable jury to conclude that: (1) two knives were used to murder Stoddart; (2) both knives inflicted potentially fatal wounds; (3) Draper favored the knife with the serrated blade which inflicted most of the potentially fatal wounds; and (4) the other knife was used by Adamcik to inflict the other stab wound that injured Stoddart's vital structures and which had the potential to be fatal. No evidence was introduced that would contradict such conclusions.

---

[5] Dr. Garrison did not address the issue of whether wound number 1 caused Stoddart's death. He did, however, state that some of the twelve potentially fatal wounds "were inflicted after circulation had ceased, and those were a less concern simply because they would not have been fatal at this point." In other words, if a wound did not produce significant bleeding, it may have been inflicted after Stoddart's heart stopped pumping. Dr. Garrison did not rule out wound number 1 as a potentially fatal wound, nor did he address Dr. Skoumal's testimony which associated wound number 1 with two cups of blood in the pericardial sac surrounding the heart.

Adamcik nevertheless contends that his murder conviction must be vacated because "the State has not provided substantial evidence that Torey Adamcik actually killed Cassie Stoddart by putting a knife into her." In support of his contention, Adamcik asserts that the amended information charges him with actually killing Cassie, rather than participating as an accomplice. The relevant part of the amended information is described in J.I. 10, as follows:

MURDER IN THE FIRST DEGREE

That the said TOREY MICHAEL ADAMCIK, in the County of Bannock, State of Idaho, on or between the 22nd and 23rd days of September, 2006, did willfully, unlawfully, deliberately, with premeditation and with malice aforethought, kill and murder Cassie Stoddart, a human being, by purchasing knives and stabbing Cassie Stoddart from which the victim died in Bannock County, Idaho.

He claims that in order to convict him of murder, the State was required to prove that he actually inflicted the fatal stab wound that resulted in Stoddart's death.

To be found guilty of murder, it was not necessary for Adamcik to have inflicted the fatal wound. It was only necessary to show that he aided and abetted in its commission. As this Court stated six decades ago:

> The common law distinction between classes of parties to criminal offenses is abolished. All persons concerned in the commission of a crime are principals, and one who aids and abets another in the commission of a crime is a principal.
>
> No reference to accused as an accessory is necessary.
>
> Nor is it necessary that facts be set out showing whether the accused was an accessory or a principal.
>
> An accessory to a crime, or a participant therein may be charged as a principal, and the information need not allege facts different from those required to be alleged against the principal.

*State v. So*, 71 Idaho 324, 331, 231 P.2d 734, 738 (1951) (citations omitted). More recently we stated, "In Idaho there is no distinction between principals and aiders and abettors, and it is unnecessary [that] the charging document allege any facts other than what is necessary to convict a principal." *State v. Johnson*, 145 Idaho 970, 976, 188 P.3d 912, 918 (2008).

Since 1864, Idaho has had a statute providing that a charging document alleging that a defendant committed a crime as a principal is sufficient to also charge the defendant with being an accessory before the fact. As currently codified, it states:

> The distinction between an accessory before the fact and a principal and between principals in the first and second degree, in cases of felony, is abrogated; and *all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission*, though not present, *shall hereafter be prosecuted, tried, and punished as principals,* and no other facts need be alleged in any indictment against such an accessory than are required in an indictment against his principal.

I.C. § 19-1430 (emphasis added). Under this statute, an information charging a defendant with committing a crime as a principal also charges the defendant with aiding and abetting its commission. The defendant is also presumed to know that the charge includes both committing the crime as the principal and acting as an accessory before the fact. Furthermore, "All persons concerned in the commission of a crime . . . *whether they directly commit the act constituting the offense or aid and abet in its commission*, or, not being present, have advised and encouraged its commission . . . *are principals in any crime so committed*." I.C. § 18-204 (emphasis added). So, "[t]ogether, I.C. § 18-204 and I.C. § 19-1430 show a legislative intent to consider defendants as principals whether they directly committed the crime or aided and abetted in the commission of the crime." *State v. Johnson*, 145 Idaho at 974, 188 P.3d at 916.

In this case, there certainly was sufficient evidence to convict Adamcik under an aiding and abetting theory. There is evidence that both Draper and Adamcik were in the Whispering Cliffs house, lying in wait for Stoddart. Two knives were used in the murder, both of which potentially caused Stoddart's death. There is no evidence that a single person, holding both knives, inflicted all of the stab wounds. It is therefore both reasonable and likely for a jury to infer that Draper and Adamcik both stabbed Stoddart until she died. Furthermore, the video footage taken immediately before and after the murder demonstrates Adamcik's preparation for, and involvement in, the murder, as do the sets of clothing and masks found at Black Rock Canyon. The sufficiency of the evidence to convict Adamcik on an accomplice theory, therefore, cannot reasonably be questioned.

Adamcik argues that without sufficient evidence to convict him as a principal, this Court cannot affirm the conviction on aiding and abetting grounds without violating his right to a jury trial and his right to due process. Adamcik also argues that any error resulting from the lack of an aiding and abetting instruction is not harmless because the sentencing court made its determination based on Adamcik's guilt as a principal, rather than as an accomplice. Aiding and abetting, however, is not treated as a separate offense with different elements, so affirming

15

Adamcik's conviction here would not violate his right to due process. In fact, we have previously affirmed convictions on an aiding and abetting theory even when the State failed to expressly charge the defendant as an accomplice. In *State v. Ayres*, for example, Ayres contended that he was denied a fair trial when the information charged him as a principal, but a State's witness suggested he could be an accomplice. 70 Idaho 18, 25–26, 211 P.2d 142, 145 (1949). In that case, Ayres and his passenger, Trautman, were involved in a collision with another vehicle, which killed Trautman and four of the five passengers in the other vehicle. *Id.* at 23, 211 P.2d at 144. The information charged Ayres with involuntary manslaughter, alleging that Ayres was driving at the time of the crash. *Id.* at 24–25, 211 P.2d at 145. We held the information was sufficient to put Ayres on trial under either a principal or accomplice theory, even though it only charged him as a principal. *Id.* at 25, 211 P.2d at 145. So, when the State subsequently presented an aiding and abetting theory in rebuttal to Ayres's testimony that Trautman was driving at the time of the crash, this Court determined there was no fatal variance from the information and Ayres was not denied a fair trial. Rather, we held that Ayres "was fully advised of the acts he was charged to have committed, and he is presumed to know that he would be a principal and guilty as such whether he directly committed the acts charged or aided and abetted in their commission by another." *Id.* at 27–28, 211 P.2d at 147. The information charging Adamcik with killing Stoddart by purchasing knives and stabbing her, as set out in J.I. 10, was therefore sufficient to put him on notice that he could be found guilty as an accomplice in Stoddart's murder.

It was simply unnecessary for the State to prove Adamcik inflicted *the* fatal wound. In *State v. Owen*, William Owen and Kenneth Hastings, each armed with a gun, entered a market intending to commit a robbery. When one of the proprietors grabbed a meat cleaver and started around the meat counter, Owen fired a warning shot trying to scare the proprietor into stopping. 73 Idaho 394, 253 P.2d 203 (1953). The proprietor kept advancing, and Owen, as he was backing towards the door, fired a second warning shot and yelled, "Let's get out of here." *Id.* at 400, 253 P.2d at 206. Hastings made it out the door, and as Owen reached the door with the proprietor close behind, Owen fired a third shot, killing the proprietor. On appeal, this Court held that under I.C. § 19-1430, "Hastings was properly charged, tried and convicted as a principal. . . . He was equal in guilt with Owen." *Id.* at 419, 253 P.2d at 218. Defendants acting in concert are thus equally guilty of the crime charged. Accordingly, Adamcik, whether a

16

principal or an accomplice in Stoddart's murder, is liable as a principal; he is liable as if he and he alone inflicted each of the wounds that ultimately killed Stoddart.

We have also determined that it is unnecessary to instruct a jury on a unanimity requirement as to which theory—principal or accomplice—the jury used in making its determination. "[I]t is unnecessary to instruct the jury that it must be unanimous as to the theoretical basis for committing the offense (aider and abettor or principal) because aiding and abetting is not a separate offense from the substantive crime." *State v. Johnson*, 145 Idaho at 978, 188 P.3d at 920. Because both principal and accomplice theories are just different means of proving the underlying charge—*e.g.*, murder—there are no additional elements the State must prove and it is unnecessary to provide a unanimity instruction. *See id.*

*Ayres*, *Owen*, and *Johnson* demonstrate the extent to which this Court treats principals and accomplices as one and the same. In other words, when the State has initially advanced a theory of principal liability but not accomplice liability, it may nonetheless seek to convict the defendant as an accomplice without violating due process. In this case, J.I. 12 instructed the jury that if it found that Adamcik "engaged in conduct that caused the death of Cassie Jo Stoddart," then it must find him guilty. That instruction incorporates the concept of aiding and abetting. It is written so that the wording covers both someone who personally inflicted the fatal wound and someone who aided and abetted the killing. Both of them—the principal and the accomplice— would have engaged in conduct that caused the death of the victim.

"'[A]iding and abetting' requires some proof that the accused either participated in or assisted, encouraged, solicited, or counseled the crime. Mere knowledge of a crime and assent to or acquiescence in its commission does not give rise to accomplice liability." *State v. Randles*, 117 Idaho 344, 347, 787 P.2d 1152, 1155 (1990) *overruled on other grounds by State v. Humpherys*, 134 Idaho 657, 660–62, 8 P.3d 652, 655-57. Here, the jury was instructed that to find Adamcik guilty, it must find beyond a reasonable doubt that he "acted without justification or excuse," and that he acted "with malice aforethought." To find that he acted with malice aforethought, the jury was instructed that the State must prove either that he "deliberately intended to kill another human being without legal justification or excuse" or that he "intentionally engaged in conduct dangerous to another under circumstances which demonstrated

17

an extreme indifference to the value of human life."[6]   There is no contention that Adamcik merely had knowledge of the crime and assented to or acquiesced in its commission, and under this instruction, the jury could not have found him guilty of murder had that been true.

The jury was not asked to find that Adamcik personally inflicted the fatal wound, nor was such a finding required for him to be guilty of murder.  There is no contention that the jury may have concluded that he was guilty of murder based upon conduct that was merely negligent.  The jury found that he acted "with malice aforethought" when he engaged in conduct that caused Cassie Jo's death.

The jury also found, with respect to Adamcik's intent, that he was guilty of conspiracy to commit murder in the first degree.  The jury found that on or between September 22 and 23, 2006, Adamcik and Brian Lee Draper agreed to commit the murder, that Adamcik intended that the murder be committed, and that he did at least one of four listed acts for the purpose of carrying out the agreement.  There is no contention that the jury was improperly instructed regarding the conspiracy charge, nor is there any contention that the evidence was insufficient to support a verdict of guilty on that charge.  There is no contention that Adamcik withdrew from that conspiracy before Cassie Jo Stoddart was murdered, nor was there any evidence so indicating.  There is no contention that he was not present at her murder, and the undisputed evidence showed that he was.  There is no contention that the evidence was insufficient to show that he aided and abetted her murder, and there is no factual dispute on that issue.

Even assuming Adamcik had been able to establish the existence of error, it would be harmless. Adamcik argues that the failure to give an aiding and abetting instruction was not harmless for three reasons.  First, he asserts that "the state should not be shielded from the consequences of its own strategic choices. . . .  It did not seek a jury instruction on that theory."  Adamcik does not explain how he was prejudiced by the State's failure to request an instruction on aiding and abetting, nor does he explain how the instruction given would not cover conduct that constituted aiding and abetting even though those precise words were not used.

---

[6] The malice instruction included a third manner of proving malice, which was, "The defendant deliberately intended to kill as a result of provocation which the jury determines would not have caused a reasonable person to have lost his self-control and reason."  There was no evidence that Adamcik reacted to any provocation by Stoddart. But "[t]he absence or presence of provocation is a pertinent fact which must be considered with all the other circumstantial evidence relevant to the appellant's actions."  *State v. Beason*, 95 Idaho 267, 276, 506 P.2d 1340, 1349 (1973).  The absence of considerable provocation was relevant to show that Adamcik acted with malice as otherwise defined.

Second, he contends that the failure to instruct on aiding and abetting was not harmless because it "is inconsistent with the Sixth Amendment right to a jury trial." He argues, "Here no jury has ever been presented with the question of whether Torey is guilty under an accomplice liability theory." When instructing the jury on reasonable doubt, we have not required any particular form of words as long as the instructions, taken as a whole, correctly convey the concept of reasonable doubt. *State v. Sheahan*, 139 Idaho 267, 273, 77 P.3d 956, 962 (2003); *accord State v. Row*, 131 Idaho 303, 310, 955 P.2d 1082, 1089 (1998). We have likewise not required any particular wording when instructing the jury regarding liability as an accomplice. *See State v. Ehrmantrout*, 100 Idaho 202, 595 P.2d 1097 (1979). Adamcik states that the jury instruction defining murder "allowed the jury to find Torey guilty of Murder even if the jury found he did not inflict the fatal wound or even stab Cassie so long as he engaged in some conduct which caused Cassie's death." He does not argue, however, that the concept of accomplice liability is not covered by the wording of the jury instruction that he "engaged in conduct which caused the death of Cassie Jo Stoddart," that he "acted without justification or excuse," and that he acted "with malice aforethought."

Finally, he alleges, "If the conviction is affirmed under an aiding and abetting theory, Torey's due process right to be only convicted of the charge actually lodged against him would be violated." One hundred years ago, this Court stated, with respect to Idaho Code section 19-1430, that the statute "specifically abrogates all distinctions heretofore existing between accessories and principals, and so under the statute of this state an accessory is now prosecuted as a principal." *State v. Cramer*, 20 Idaho 639, 659, 119 P. 30, 36-37 (1911). Over six decades ago this Court held:

> The prosecuting attorney, in drawing up an information is not bound to elect between charging a defendant as a principal or as an accessory before the fact. Under the terms of the statute [Idaho Code section 19-1420] he may ask for a verdict of guilty if the evidence is sufficient to satisfy the jury upon either theory.

*State v. Ayres*, 70 Idaho 18, 26-27, 211 P.2d 142, 146 (1949). As we stated in *Ayres*, the defendant "is presumed to know that he would be a principal and guilty as such whether he directly committed the acts charged or aided and abetted in their commission by another." *Id*. at 27-28, 211 P.2d at 147 (emphasis added). Thus, the amended information charged Adamcik as aiding and abetting in the killing of Cassie Jo Stoddart. As we stated in *State v. Johnson*, 145 Idaho at 976, 188 P.3d at 918, "In Idaho there is no distinction between principals and aiders and

19

abettors, and it is unnecessary the charging document allege any facts other than what is necessary to convict a principal." An information charging a defendant with a crime also charges the defendant with aiding and abetting the commission of that crime. Therefore, "because Idaho has abolished the distinction between principals and aiders and abettors, and because it is well-established in Idaho that it is unnecessary to charge the defendant with aiding and abetting, we hold there was no variance, constructive amendment, or due process violation." *Id*. at 977, 188 P.3d at 919.

Adamcik cites several United States Court of Appeals and Supreme Court cases that suggest the failure to affirm a conviction pursuant to the same charge, and under the same law and acts underlying the conviction, violate due process. This case, however, is readily distinguishable. Adamcik cites *McCormick v. U.S.*, in which the U.S. Supreme Court said,

> This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instruction and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

500 U.S. 257, 270 n.8 (1991).

Adamcik also cites *Dunn v. U.S.*, 442 U.S. 100, 106 (1979) for the proposition that it is a violation of due process to convict the defendant based on facts substantially different from those alleged in the charging document. In *Dunn*, the U.S. Supreme Court reversed a Court of Appeals decision that affirmed a perjury conviction based on testimony the jury did not consider in rendering its guilty verdict. *Id.* In reaching its decision, the Court wrote: "appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial." *Id.* at 107. "To uphold a conviction," said the Court, "on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process." *Id.* at 106. Central to the Court's analysis was a discrepancy in dates of the defendant's testimony, which was material evidence in the Government's perjury case: "the jury was instructed to rest its decision on Dunn's September statement, the Tenth Circuit predicated its affirmance on petitioner's October testimony." *Id.* The Court of Appeals thus upheld a conviction on evidence not before the jury. But, where the State has charged the defendant in a general indictment, and an appellate court can affirm a defendant's conviction under the same law as the trial court, there is no due process issue. *See Santellan v. Cockrell*,

20

271 F.3d 190, 197 (5th Cir. 2001) ("Because of the general nature of the indictment and the jury charge, and because the [appellate court] affirmed on the basis of the same law and the same ultimate acts that underlay the conviction in the trial court, neither *Dunn* nor *McCormick* is applicable to [the defendant's] case.").

Here, unlike *Dunn* and *McCormick*, there are not multiple charges or distinct facts the jury did not consider; the information charged Adamcik with murder and the jury considered all the evidence we now discuss. There is no distinction between principals and accomplices in Idaho, so the information charging murder put Adamcik on notice of both theories. The jury need not find separate facts, nor consider distinct elements of a crime to convict for murder as a principal or as an accomplice because both theories support the crime. So, unlike *McCormick*, we are not making an independent finding of fact. And, unlike *Dunn*, this case involved a generalized information, supporting either the principal or accomplice theory. We therefore affirm Adamcik's first degree murder conviction.

**B. The district court did not err in denying Adamcik's motion to suppress statements that he made to detectives after his parents had invoked his Fifth Amendment right to counsel.**

On September 27, 2006, the police requested that Adamcik come to the police station for an interrogation. Adamcik's parents, Sean and Shannon Adamcik, repeatedly requested that the interrogation be delayed until the next day, when an attorney that they had consulted with would be available to assist. However, the Adamciks eventually acquiesced to the detectives' request and the interrogation took place that night. The interrogation was videotaped. Sean and Shannon were present when the detectives read Adamcik his *Miranda* rights, and when Adamcik signed a waiver form. Midway through the interrogation Shannon left in order to pick up another child from a school function, but Sean remained present throughout.

After approximately one hour and twenty minutes of interrogation, Adamcik invoked his right to counsel. At that point, the interrogation was terminated and Adamcik and Sean were taken to a separate room where they held a private and unrecorded conversation for approximately ten minutes. After that private conversation, Adamcik and Sean again met with detectives in the interrogation room. At this point the following exchange took place:

> **Detective Thomas**: Dad, I think we owe it to you at this point to find out what we know at this point. There's just no easy way to tell you this. We do know that Sean, excuse me Torey and . . . um
>
> **Detective Ganske**: Brian

21

**Detective Thomas**: . . . Brian had gone back into the house. Okay? We do know that the two of them murdered, we do know that they murdered Cassie. Okay? We've got the evidence at this point to prove that, also—

**Detective Ganske**:—We found the evidence

**Detective Thomas:** We also have some overwhelming evidence . . . uh, trace evidence, that type of stuff that is going to prove that they did it as well. It's not just hearsay. It's not just somebody saying it. And then we do have a confession from another person giving full disclosure.

**Sean**: [to Adamcik] So is that why you want to talk to a lawyer?

**Detective Ganske**: And here's the deal with you [looking and gesturing at Sean]. What I would like to do is maybe when your wife comes back, sit down and talk to you all, and get you up to speed. [turning and looking at Adamcik and gesturing at Adamcik] You know what you need to do. You know exactly what happened and you know what you need to do. So unfortunately, you are not going anywhere tonight. You're going to be placed in custody tonight. Okay? I'm sorry that's the way it goes, but . . .

**Detective Thomas**: You are going to be charged with First Degree Murder. Okay?

**Detective Ganske**: Okay? But like I said before, before you say anything, I encourage you, you want to talk to an attorney, you should do that. I am not pullin' punches here . . . still, your full cooperation can do nothing but help you at this point in time.

**Sean**: Understand that Torey?

**Detective Ganske**: Okay?

**Sean**: I know you need a lawyer, or whatever, you want to talk to a lawyer. I understand that's the advice they—

**Detective Ganske**:—or—

**Sean**: —gave you today and you, and then whatever you and the lawyer work out, they want you to cooperate [the last five words of this sentence were difficult to make out as Detective Ganske began talking over Sean]

**Detective Ganske**: [facing Adamcik]—We know the details. We've got the knife that you used, we got the masks that you used, we've got the videotape. We've got it. There's a tape up in there that you buried. Okay? You tried to catch it on fire. All that stuff. You know what I'm talking about, I don't need to tell you that.

**Sean**: This is right, Torey . . .

**Adamcik**: Yeah.

**Sean**: What they are saying is true?

**Adamcik**: [nodding yes]

There was continued interaction following this point, but the district court granted Adamcik's motion to suppress as to the remainder of the recorded interaction.

Adamcik argues that: (1) his parents invoked his Fifth Amendment right to counsel,[7] as applied to Idaho by the Fourteenth Amendment, prior to the September 27, 2006, interrogation; (2) Adamcik was questioned after his parents had invoked his right to counsel and before he had been provided with access to an attorney; and (3) even if the initial interrogation was not a violation of his rights, the continuing statements following Adamcik's unequivocal invocation of his right to counsel were designed to elicit a response from him. Adamcik concludes that the entire interrogation should have been suppressed or, alternatively, that the exchange which took place subsequent to his invocation of his right to counsel should be suppressed.

The State argues that: (1) Adamcik's parents could not invoke his right to counsel on his behalf; (2) even if Adamcik's parents could have invoked his right to counsel, they failed to unequivocally do so; (3) if Adamcik's parents did unequivocally invoke his right to counsel, they subsequently and voluntarily acquiesced to the interrogation proceeding; (4) Adamcik himself executed a waiver of his *Miranda* rights in his parents' presence, and that waiver was knowing, voluntary and intelligent; and (5) the statement and nonverbal response made by Adamcik, following his invocation of his right to counsel, was in response to Sean's questioning and Sean was not a State actor. The State argues that the district court correctly denied Adamcik's motion for suppression of evidence as to these portions of the video-taped interrogation. The district court assumed *arguendo* that Adamcik's parents had unequivocally invoked his Fifth Amendment right to counsel.

We shall first consider whether a parent may invoke the right to counsel on behalf of a minor child. Second, assuming Adamcik's parents did invoke the right to counsel on his behalf, whether that invocation was scrupulously honored by the detectives until it was subsequently waived. Finally, whether Adamcik's verbal and nonverbal responses to Sean's questions, after the invocation of his right to counsel, should have been suppressed.

1. Standard of Review

"When we review an order granting or denying a motion to suppress, we accept the trial court's factual findings, unless they are clearly erroneous." *State v. Fees*, 140 Idaho 81, 84, 90

---

[7] *See Davis v. United States*, 512 U.S. 452, 456-57 (1994) (noting that although the Sixth Amendment right to counsel only attaches at the initiation of adversarial criminal proceedings, a suspect subjected to custodial interrogation has the right to counsel to protect his Fifth Amendment right against compulsory self-incrimination).

P.3d 306, 309 (2004). "However, free review is exercised over a trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *State v. Doe*, 137 Idaho 519, 522, 50 P.3d 1014, 1017 (2002) (quoting *State v. Donato*, 135 Idaho 469, 470, 20 P.3d 5, 6 (2001)). "A district court's conclusion that a defendant made a knowing and voluntary waiver of his *Miranda* rights will only be disturbed on appeal if the conclusion is not supported by substantial and competent evidence." *State v. Payne*, 146 Idaho 548, 558, 199 P.3d 123, 133 (2008).

In determining whether a defendant has voluntarily, knowingly and intelligently waived his *Miranda* rights, this Court must consider the totality of the circumstances. *Doe*, 137 Idaho at 523, 50 P.3d at 1018; *Payne*, 146 Idaho at 559, 199 P.3d at 134. The factors the Court must consider include: "(1) Whether *Miranda* warnings were given; (2) The youth of the accused; (3) The accused's level of education or low intelligence; (4) The length of detention; (5) The repeated and prolonged nature of the questioning; and (6) Deprivation of food or sleep." *Doe*, 137 Idaho at 523, 50 P.3d at 1018. "Any waiver of *Miranda* warnings must be knowing, intelligent, and voluntary." *Id*.

2.  Adamcik's parents could invoke his right to counsel.

In *Doe*, we said "[a] minor's parents may invoke the right to counsel for the child, but that request must also be clear and unambiguous." 137 Idaho at 525, 50 P.3d at 1020. *See also United States v. Doe*, 60 F.3d 544, 546 (9th Cir. 1995) (examining whether minor's parent had unequivocally invoked his right to counsel, thus implying that the parent could do so). In *Doe*, the Appellant (a minor) argued that an interview he had with detectives should have been suppressed because his mother had invoked his right to counsel. 137 Idaho at 524, 50 P.3d at 1019. The *Doe* Court recognized that the mother could have done so, but concluded that the mother's conduct—in asking the police whether she needed an attorney for her son, and what to do since she could not afford one—did not amount to a clear and unambiguous request for counsel. *Id*. at 525, 50 P.3d at 1020.

The State argues that this Court's statement in *Doe* should be considered *obiter dictum*, as this Court ultimately concluded that the Appellant's mother had not invoked his right to counsel. However, the *Doe* Court did not indicate that it was assuming *arguendo* that a parent could invoke their minor child's right to counsel, but then make a finding that the parent had not

24

done so. Rather, the Court clearly stated that a parent could do so, and then applied the proper standard to determine whether it had been done under the facts at hand.[8]

In Idaho, a parent may invoke the right to counsel on behalf of a minor child. The reasoning for this principle of law was aptly stated by the Court of Appeals of New York in *People v. Mitchell*:

> Children of tender years lack an adult's knowledge of the probable cause of their acts or omissions and are least likely to understand the scope of their rights and how to protect their own interests. They may not appreciate the ramifications of their decisions or realize all the implications of the importance of counsel. Indeed, the need for counsel "has been recognized as all the more vital with respect to the unsophisticated, who are often uneducated in the ways of the criminal justice system and unaware of the role counsel can play in protecting their interests."

810 N.E.2d 879, 882 (N.Y. 2004) (quoting *People v. Settles*, 385 N.E.2d 612, 614 (N.Y. 1978)).

3. Assuming *arguendo* that Adamcik's parents did invoke his right to counsel, Adamcik's *Miranda* rights were not violated.

A suspect must unambiguously request counsel in order to invoke his Fifth Amendment right to counsel—"he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S 452, 459 (1994). Where an individual asserts his right to counsel, the interrogation must cease until counsel has been made available to him, or until he himself "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981).

The district court below did not make a factual finding as to whether or not Adamcik's mother, Shannon, had invoked his Fifth Amendment right to counsel. The court did not feel compelled to weigh the credibility of statements offered by Sean and Shannon against those offered by the three detectives, finding that even if Shannon had invoked Adamcik's right to counsel, that right was subsequently waived.

Where an individual has invoked his right to counsel, the police may not continue to interrogate him until he has either been provided with access to an attorney or until he himself

---

[8] The State cites to *People v. Young*, 850 N.E.2d 284, 298–99 (Ill. App. 2006), in support of its argument that the Court's statement in *Doe* was *dicta*; however, the views of the Illinois Court of Appeals are neither binding nor instructive to this Court in its interpretation of Idaho law.

reinitiates communication with the police, as was noted in *Edwards*. 451 U.S. at 485. Where a parent has invoked the right to counsel on behalf of a minor child, and the police continue to request that the parent waive that right, there is no violation—as the child is not being questioned by the police. *See, e.g.*, *State v. Hansen*, 138 Idaho 791, 795, 69 P.3d 1052, 1056 (2003) (noting that *Miranda* rights apply where a person is subject to custodial interrogation). Furthermore, even if the parent agrees to waive *Miranda* rights, the minor himself will still have to agree to such a waiver, removing at least part of the rationale for the rule established in *Edwards*. *See Davis v. United States*, 512 U.S. 452, 458 (1994) (explaining that the rationale behind prohibiting the police from attempting to reinitiate communications with a suspect after he invokes his right to counsel was to prevent the defendant from being badgered into waiving his rights).

This Court applies the same standard in determining whether the police have violated a minor's *Miranda* rights—where that minor's parents are persuaded to waive the right to counsel, after previously invoking it—as is applied in determining whether an adult individual has freely waived their *Miranda* rights. Specifically, the standard is whether, under the totality of the circumstances, the court finds that the minor's parents have been coerced and intimidated in such a way that their will has been overborne. *State v. Doe*, 137 Idaho 519, 523, 50 P.3d 1014, 1018 (2002).

Adamcik argues that after Shannon invoked his right to counsel, the detectives became angry and demanding, leaving Shannon and Sean with the impression that Adamcik would be taken into custody if the interview did not take place that night. The detectives denied this, testifying that they remained calm and sympathetic, as they wanted to gain Adamcik's cooperation. The district court made no factual finding concerning the respective credibility of the affidavits and testimony before it on this issue, assuming *arguendo* that the detectives had acted in the manner that Sean and Shannon asserted that they did. The district court stated:

> Even if the Detectives' alleged impatience with Sean and Shannon escalated into a frustrated or heated state, and the threat of their son's detention provoked Sean and Shannon into agreeing to go forward with the interview, the Court does not find either tactic to be one that would overbear their ability to voluntarily agree to allow the Detectives to question Torey without the presence of an attorney.

As noted above, where substantial and competent evidence supports the district court's finding that a suspect knowingly, voluntarily and intelligently waived his *Miranda* rights, this

Court shall not disturb that finding on appeal. *State v. Payne*, 146 Idaho 548, 558, 199 P.3d 123, 133 (2008).

Where the district court fails to make a determination on the credibility of competing testimony, instead assuming *arguendo* for purposes of answering a question of law that the version of events offered by one party is true, this Court will do likewise on appeal. Assuming the veracity of Shannon and Sean's affidavits, we find that the district court had substantial and competent evidence to support its finding that the conduct the detectives engaged in was not such that it would overbear Shannon and Sean's ability to voluntarily agree to waive Adamcik's right to counsel.

> 4. Adamcik's verbal and nonverbal responses to Sean's questions, subsequent to invoking his right to counsel, were not the result of the functional equivalent of an interrogation by a State agent.

After detectives informed Adamcik that they did not believe the story he had told them, Adamcik requested an attorney. At that point, all questioning ceased and Adamcik and Sean conversed privately in another room. After approximately ten minutes, Adamcik and Sean returned and the exchange, transcribed above, occurred.

Adamcik argues that his verbal and nonverbal responses to Sean's questioning should be suppressed as the detectives engaged in conduct which was the functional equivalent of express questioning and reasonably likely to elicit an incriminating response. The State argues that the district court correctly determined that the statements made by detectives, after Adamcik invoked his right to counsel, were "not the functional equivalent of an interrogation. Rather, the statements are an objective presentation of the evidence they had gathered against [Adamcik]."

The United States Supreme Court has stated that *Miranda* safeguards protect against express questions, as well as words or actions, by the police that are likely to elicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). In *Rhode Island v. Innis*, the Court stated that:

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* (footnotes omitted).

27

The record in this case clearly demonstrates that Adamcik's verbal and nonverbal responses were in response to Sean's questions, not statements made by the detectives.

As the Ninth Circuit Court of Appeals stated in *United States v. LaPierre*:

> In determining whether a suspect was being interrogated, the critical inquiry is whether "[i]n light of both the context of the questioning and the content of the question," *United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir. 1986), the statements made by the officers were of the sort that "the police should know [are] reasonably likely to evoke an incriminating response. . . ." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). We will reverse the district court's determination that [the appellant] was not being interrogated only if the determination is clearly erroneous. *United States v. Booth,* 669 F.2d 1231, 1238 (9th Cir.1981).

998 F.2d 1460, 1466 (9th Cir. 1993) (first alteration in the original).

Here, the district court found that the statements the detectives directed at Sean were reasonable and appropriate to inform Sean of the reason why Adamcik was being arrested. The court found that the statements directed at Adamcik himself were in line with a recitation of the evidence gathered against him, rather than an interrogational line of questioning reasonably likely to evoke an incrimination response. The court went on to note that, although the statement that Detective Ganske directed toward Adamcik of "you know what you need to do" and Detective Thomas's statements about the evidence that had been gathered were "coated with a layer of precariousness," they still "do not rise to the level in which an objective observer would conclude [they] were designed to invite comment from [Adamcik]."

In reaching this conclusion, the district court compared the facts at hand to those present in cases from both the Idaho Court of Appeals (*See State v. Salato*, 137 Idaho 260, 47 P.3d 763 (Ct. App. 2001); *State v. Person*, 140 Idaho 934, 104 P.3d 976 (Ct. App. 2004)) and the Ninth Circuit Court of Appeals (*See United States v. Hsu*, 852 F.2d 407 (9th Cir. 1988); *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976); *United States v. Olof*, 527 F.2d 752 (9th Cir. 1975)). Based upon this comparison, the district court determined that under an objective examination of the circumstances, it could not be said that the detectives said anything that was the functional equivalent of an interrogation, or likely to evoke an incriminating response.

Furthermore, as the district court noted:

> Even if the Court did find that the Detectives' statements explaining the nature of the charge to Torey were designed to elicit a response from Torey, they certainly were not designed to elicit a response from Sean. Detectives Ganske and Thomas were facing Torey and speaking directly to Torey when they made the statements.

28

Adamcik did not respond to the detectives' statements, he responded to Sean's questioning. Although Adamcik argues that Sean had become an unwitting agent of the State, citing to one case from the Second Circuit Court of Appeals, *Alexander v. Connecticut*, 917 F.2d 747 (2d Cir. 1990), this argument is without merit. Adamcik contends that "[b]y manipulating Shawn's [sic] shock and the parental relationship, the detectives made Shawn [sic] an unwitting agent of [the] state by engaging in conduct they should have know [sic] was reasonably likely to cause an exchange between father and son that would produce an incriminating response." The appellant in *Alexander* admitted to his friend Papagolas that he had murdered a man named Cook. *Id*. at 749. The police had been transporting Papagolas to and from prison for his meetings with the appellant, and the Court noted that it had previously held that Papagolas had been acting as an agent of the government at the time of the appellant's confession. *Id*. at 750. However, the Court reversed that previous determination, finding that "[t]he confessions, freely made to Papagolas, show that [the appellant] had no reason to believe Papagolas was cooperating with the authorities." *Id*. The Court held that, in accordance with the U.S. Supreme Court opinion in *Illinois v. Perkins*, 496 U.S. 292 (1990), a custodial interrogation—for purposes of *Miranda*— occurs when: (1) the suspect is in police custody and (2) the suspect is aware that he is being interrogated by a government authority or representative. *Alexander*, 917 F.2d at 750-51. There is no plausible argument that Adamcik was under the impression that Sean was acting as a government representative when he questioned his son. Therefore, under the reasoning of the Court in *Alexander*, Adamcik's statements were not made in response to a custodial interrogation.

The district court correctly denied, in relevant part, Adamcik's motion to suppress, as his verbal and nonverbal responses to Sean's questioning were not the product of a custodial interrogation by a State actor, or the functional equivalent of the same.

## C. Nothing in the Jury Instructions Amounted to Reversible Error.

### 1. Standard of Review

As this Court stated in *State v. Zichko*:

> The issue of whether a particular jury instruction is necessary and whether the jury has been properly instructed is a matter of law over which this Court exercises free review. This Court reviews jury instructions to ascertain whether, when considered as a whole, they fairly and adequately present the issues and state the applicable law.

29

129 Idaho 259, 264, 923 P.2d 966, 971 (1996) (internal citations omitted). We review jury instructions as a whole because "[i]t is well established that [an] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

"No party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the instruction to which the party objects and the grounds of the objection." Idaho Crim. R. 30(b). When a defendant has objected to an instruction, we will apply the harmless error test articulated in *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). Typically, under the harmless error test, once the defendant shows that a constitutional violation occurred, the State has the burden of demonstrating beyond a reasonable doubt that the violation did not contribute to the jury's verdict. *Id.* If the jury reached its verdict based on an erroneous instruction, we will generally vacate and remand for a new trial. *Id.* at 228, 245 P.3d at 980. However, where the jury received proper instruction on all but one element of an offense, and where the Court "concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Id.* (quoting *State v. Lovelace*, 140 Idaho 73, 79, 90 P.3d 298, 304 (2004)).

When a defendant fails to object to a jury instruction, we will still review the jury instruction for fundamental error. *State v. Johnson*, 145 Idaho 970, 977, 188 P.3d 912, 919 (2008); *see also State v. Perry*, 150 Idaho at 224, 245 P.3d at 976 ("If the alleged error was not followed by a contemporaneous objection, it shall only be reviewed . . . under Idaho's fundamental error doctrine."). Before we consider whether there was fundamental error, we must first determine whether the trial court erred at all. *Johnson*, 145 Idaho at 977, 188 P.3d at 919. The *Perry* fundamental error test requires the defendant to show three things: (1) the alleged error violated an unwaived constitutional right; (2) the alleged error plainly exists; and (3) the alleged error was not harmless. *Perry*, 150 Idaho at 228, 245 P.3d at 980.

2. When viewed in the context of all other instructions, Jury Instruction 12 fairly and adequately presented the issues and the state of applicable law to the jury.

Adamcik objected to the wording of Jury Instruction (J.I.) 12 at trial, and argues that J.I. 12 allowed the jury to convict him of first-degree murder even if it did not find that he actually

stabbed Stoddart, causing her death. The State argues that J.I. 12 comports with Idaho Criminal Jury Instruction (ICJI) 704, which was approved by the Idaho Court of Appeals in *State v. Butcher*, 137 Idaho 125, 44 P.3d 1180 (Ct. App. 2002). J.I. 12 reads as follows:

> In order for the Defendant to be guilty of Murder, the State must prove each of the following:
> 1. On or between the 22nd and 23rd days of September, 2006,
> 2. in the State of Idaho
> 3. the Defendant, TOREY MICHAEL ADAMCIK, engaged in conduct which caused the death of Cassie Jo Stoddart,
> 4. the Defendant acted without justification or excuse, and
> 5. with malice aforethought.
>
> If you find that the State has failed to prove any of the above, then you must find the Defendant not guilty of Murder. If you find that all of the above have been proven beyond a reasonable doubt, then you must find the Defendant guilty of Murder, and then determine if the Defendant is guilty of First or Second Degree Murder.

In *Butcher*, the appellant argued that where he had been charged with murder under both principal and aiding and abetting theories, the term "engaged in conduct" confused the jury. 137 Idaho at 135, 44 P.3d at 1190. The Court of Appeals noted that "the term 'engaged in conduct' refers to the specific criminal acts addressed in subsequent instructions on the specific homicide offense charged and any lesser-included offenses," and found that the instruction was neither confusing nor in need of clarification. *Id*. The court in *Butcher* noted that under the circumstances of that case, as it had been presented to the jury, the phrase "engaged in conduct" referred to both the actual killing of the victim and any act constituting aiding and abetting. *Id*. The *Butcher* holding is sound and proper for application in this case.

Here, as Adamcik points out, the State never expressly presented an aiding and abetting theory of first-degree murder to the jury, and the jury was never instructed on it. The only conduct that the jury was instructed on regarding first-degree murder may be found in J.I. 10, which reads, in relevant part, as follows:

> COUNT 1
> MURDER IN THE FIRST DEGREE
> That the said TOREY MICHAEL ADAMCIK, in the County of Bannock, State of Idaho, on or between the 22nd and 23rd days of September, 2006, did willfully, unlawfully, deliberately, with premeditation and with malice aforethought, kill and murder Cassie Stoddart, a human being, by purchasing knives and stabbing Cassie Stoddart from which the victim died in Bannock County, Idaho.

31

The specific conduct mentioned in J.I. 10 is "kill[ing] and murder[ing] Cassie Stoddart, a human being, by purchasing knives and stabbing Cassie Stoddart."

"[W]here the language of the indictment or information goes beyond alleging elements of the crime, it is mere surplusage that need not be proved. However, the inclusion of surplusage must not be allowed to prejudice a defendant in the context of his case." *Butcher*, 137 Idaho at 134, 44 P.3d at 1189 (internal quotation marks omitted). Here, the inclusion of the words "purchasing knives" was mere surplusage. Reading J.I. 10 as a whole, it is clear that the jury could not reasonably have concluded that it could convict Adamcik of first-degree murder merely on a finding that Adamcik had purchased knives. Not only is it readily apparent to any reasonable jury that one cannot "kill and murder" through the mere purchase of weaponry, but the language concerning the purchasing of the knives is phrased in the conjunctive with the language concerning the fatal stabbing itself. Furthermore, and as discussed at length in Part III.A.2, the State need not prove Adamcik inflicted *the* fatal wound, or any wound, so long as it proved he was an accomplice in Stoddart's killing.

For this same reason, J.I. 12 was not misleading to the jury and did not allow the prosecution to obtain a conviction without demonstrating that Adamcik killed or assisted in killing Stoddart. J.I. 12 required the State to prove that Adamcik engaged in conduct causing Stoddart's death. Further, J.I. 10 required that such conduct consist of killing with malice aforethought. Although J.I. 10 could have been better worded so as to clarify that the State need not demonstrate that Adamcik inflicted *the* fatal blow, we find that J.I. 10, in conjunction with J.I. 12, can be reasonably interpreted to require that the State prove that Adamcik murdered, or helped Draper murder, Stoddart.

Certainly, the jury in this case understood the State's theory that Adamcik and Draper acted in concert to murder Stoddart: that Adamcik planned the murder; that he lay in wait with Draper to help carry out the murder; and that he inflicted at least one stab wound that could have killed Stoddart. These theories of first-degree murder are adequately described in the jury instructions provided in this case by requiring that the jury find that Adamcik engaged in conduct which caused Stoddart's death. Thus, the trial court did not err in giving these instructions.

3. The district court did not err in failing to provide the jury with a unanimity instruction requiring that each member of the jury agree on a specific act that Adamcik committed which caused Stoddart's death.

Adamcik argues, for the first time on appeal, that the district court erred in not providing the jury with a specific unanimity instruction. While conceding that in a typical case a general unanimity instruction (such as those provided in J.I. 26 and J.I. 27 here) suffices, Adamcik argues that here there is a genuine possibility that the jury may have been confused and that different jurors may have concluded that Adamcik committed different acts. Adamcik acknowledges that he did not raise this argument before the district court but contends that this Court should nevertheless consider it under the fundamental error doctrine, as it violates Adamcik's right to a unanimous jury. The basis for Adamcik's claim is that the murder charge in J.I. 10 listed two acts, "purchasing knives" and "stabbing Cassie Stoddart," and the conspiracy charge in J.I. 17 listed four acts which could have been found to have caused Stoddart's death. Adamcik also contends that this Court's decision in *State v. Nunez*, 133 Idaho 13, 981 P.2d 738 (1999), was based on an erroneous reading of precedent and should be overruled.

The State argues that Adamcik was only charged with killing Stoddart in one way, by stabbing her with a knife, and it would be unreasonable to read the jury instructions in any other manner. In addition, the State argues that, in accordance with *State v. Severson*, 147 Idaho 694, 215 P.3d 414 (2009), the unanimity requirement does not extend to a murder victim's cause of death.

Idaho law requires a trial court to instruct a jury that, in order to convict a defendant, it must unanimously agree on the defendant's guilt. *State v. Severson*, 147 Idaho 694, 711, 215 P.3d 414, 431 (2009). "An instruction that the jury must unanimously agree on the facts giving rise to the offense, however, is generally not required." *Id.* There is an important exception to this general principle "when a defendant commits several acts, each of which would independently support a conviction for the crime charged." *Id.* Adamcik contends the exception applies here.

In support of his contention that he was entitled to a unanimity instruction, Adamcik cites *Miller v. State*, 135 Idaho 261, 268, 16 P.3d 937, 944 (Ct. App. 2000). That case involved charges of sexual misconduct between the defendant and a young girl. *Id.* at 264, 16 P.3d at 940. There, the State could have properly charged the defendant with six specific instances of sexual misconduct. *Id.* at 261, 16 P.3d at 944. "The court reasoned that [a unanimity] instruction was proper because each instance in which the [sexual misconduct] took place was 'a separate incident—a distinct union of *mens rea* and *actus reas* separated by a discrete period of time and

33

circumstance from any other such similar incident." *Severson*, 147 Idaho at 711, 215 P.3d at 431 (quoting *Miller*, 135 Idaho at 268, 16 P.3d at 944).

In *Severson*, the defendant was not entitled to a unanimity instruction. In that case, the defendant was charged with a single count of first-degree murder and a count of poisoning food and/or medicine. *Id.* at 701, 215 P.3d at 421. The defendant argued that the jury could have found him guilty of murder for killing his wife with sleeping pills, or suffocating her, or both. *Id.* at 710, 215 P.3d at 430. We concluded that "[a]lthough the evidence at trial showed that Severson could have murdered his wife by either overdosing her or suffocating her, it did not indicate that separate incidents involving distinct unions of *mens rea* and *actus reas* occurred." *Id.* at 712, 215 P.3d at 432. Our analysis highlighted an obvious characteristic of murder: it is a crime that cannot be perpetrated on the same victim twice. *See id.* We thus held that absent any evidence that Severson engaged in the charged conduct—*i.e.*, murdering his wife—on more than one occasion, "the jury was not required to unanimously agree on the facts giving rise to the offense." *Id.*

In this case, Adamcik was charged with a single murder. There was no evidence that Adamcik engaged in the charged conduct on multiple occasions; indeed, "[t]he very nature of the crime of murder eliminates this possibility." *Id.* Thus, Adamcik was not entitled to a unanimity instruction under existing precedent.

Furthermore, Adamcik's argument that some members of the jury may have convicted him of murder for the act of "purchasing knives" as that phrase is included in J.I. 10, is unavailing. This claim has been dealt with above. Not only is the phrase in question properly viewed as surplusage, but even if the jury did not recognize it as such, it is phrased in the conjunctive with "and stabbing Cassie Stoddart." Therefore, there is no genuine possibility that the jury was confused as to whether they could convict Adamcik of first-degree murder solely by finding that he purchased knives.

Adamcik's other argument, that some "jurors could have found that he engaged in conduct resulting [in] the death of [Stoddart] by finding that he committed any of the other alleged overt acts done in the furtherance of the conspiracy," also fails. The jury was specifically instructed in J.I. 20, that:

> Each count charges a separate and distinct offense. You must decide each count separately on the evidence and the law that applies to it, uninfluenced by your

decision as to any other count. The defendant may be found guilty or not guilty on none, some, or all of the offenses charged.

Adamcik does not explain why the jury would have disregarded this express instruction and considered the conduct alleged in Count 2 (conspiracy) when reaching a decision on Count 1 (first-degree murder). Because Adamcik fails to support his position on this issue, we must conclude there is no genuine possibility that the jury was confused as to whether they could convict Adamcik of first-degree murder based on the conduct alleged under Count 2. *See State v. Nunez*, 133 Idaho 13, 19, 981 P.2d 738, 744 (1999) (noting that where the jury was instructed to consider each count separately, this Court presumes that instruction was followed). Thus, the trial court's lack of a unanimity instruction was not in error and therefore could not amount to fundamental error.

> 4. The district court's jury instructions regarding malice did not misstate the law nor lower the State's burden of proof.

The district court provided the jury with four instructions regarding malice, J.I. 13-A, J.I. 13-B, J.I. 14 and J.I. 15. J.I. 13-A reads:

> Any *unlawful killing of a human being with malice aforethought is murder*. If nothing further characterizes the killing, the murder is of the second degree. To constitute the higher offense of murder in the first degree, there must be willfulness, deliberation and premeditation in addition to malice aforethought.
> Willfulness means that there was manifested a clear intent to take life.
> Deliberation and premeditation means done with reflection and conceived beforehand and not done upon a sudden heat of passion or other condition precluding the idea of deliberation.

J.I. 13-B provides that "[m]alice is the state of mind manifested by the doing of an unlawful and felonious act intentionally, deliberately, and without legal cause or excuse." J.I. 14 states that "[m]alice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Finally, J.I. 15 states:

> Malice aforethought exists when:
> 1. The evidence shows that the defendant deliberately intended to kill another human being without legal justification or excuse; or
> 2. The defendant intentionally engaged in conduct dangerous to another under circumstances which demonstrated an extreme indifference to the value of human life; or

35

3. The defendant deliberately intended to kill as a result of provocation which the jury determines would not have caused a reasonable person to have lost his self-control and reason.

Malice as used in these instructions does not require any ill will or hatred toward the person killed.

Adamcik argues that J.I. 14 and J.I. 15 are inconsistent with Idaho Criminal Jury Instruction 702[9] and, when read as a whole, misinstructed the jury as to an essential element of the offense. Adamcik concedes that he did not object to the jury instructions on this ground at trial, but argues that the defective instructions amount to fundamental error. The State argues that the doctrine of invited error precludes Adamcik from raising any objection to the jury instructions regarding malice, as Adamcik acquiesced to that instruction being given (though he objected to J.I. 14 and J.I. 15 on other grounds).

> *i. The doctrine of invited error does not bar Adamcik from challenging J.I. 14 and J.I. 15 on appeal.*

"The purpose of the invited error doctrine is to prevent a party who caused or played an important role in prompting a trial court to give or not give an instruction from later challenging that decision on appeal." *State v. Blake*, 133 Idaho 237, 240, 985 P.2d 117, 120 (1999). In *Blake*, the district court provided the appellant with the proposed jury instructions, and his counsel stated "[y]our honor, we would concur. We have nothing to say on the record at this time." *Id*. The State argued that this statement caused or prompted the district court to give the disputed instructions and that, therefore, the invited error doctrine should preclude the appellant from challenging these instructions on appeal. *Id*. This Court disagreed, finding that the district court was merely giving the parties the opportunity to object to the instructions on the record, after having already decided which instructions to provide, and that the appellant had, therefore, not invited any error by failing to object. *Id*.

---

[9] ICJI 702 reads as follows:

Malice may be express or implied.
Malice is express when there is manifested a deliberate intention unlawfully to kill a human being.
Malice is implied when:
1. The killing resulted from an intentional act,
2. The natural consequences of the act are dangerous to human life, and
3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought. The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

The word "aforethought" does not imply deliberation or the lapse of time. It only means that the malice must precede rather than follow the act.

36

In *State v. Caudill*, the appellant, Caudill, argued that testimony offered by a detective regarding a conversation the detective had previously had with the Caudill's codefendant violated Caudill's Sixth Amendment right of confrontation. 109 Idaho 222, 225, 706 P.2d 456, 459 (1985). This Court found that, although the testimony in question would have constituted a violation of Caudill's right to confrontation, the testimony had been brought out by the question of Caudill's counsel, not the State. *Id*. at 226, 706 P.2d at 460. Therefore, the doctrine of invited error precluded reversal on those grounds. *Id*.

Here, Adamcik's counsel did object to the proposed jury instructions as they pertained to malice, though not on the grounds raised here. This was not identical to the situation in *Blake*, as some minor alterations were made to the jury instructions as a result of Adamcik's objections, so it cannot be said that the trial court had already reached an absolute determination as to the exact instructions that would be offered. However, unlike the appellant in *Blake*, Adamcik did not state that he concurred with the Court's proposed instructions, nor did he himself request the instructions, so this case is not analogous to *Caudill*. Thus, we hold that Adamcik is not precluded by the invited error doctrine from raising this issue on appeal, as he did not encourage the district court to offer the specific malice instructions given, but merely failed to object.

> *ii. The trial court's instructions in J.I. 14 and J.I. 15 did not constitute fundamental error.*

Adamcik argues that the trial court erred in referencing "provocation" in J.I. 14 and 15, as it was not at issue under the facts of this case, is not part of ICJI 702, and could only serve to confuse the jury here. The State argues that it is nearly impossible to see how an issue so plainly inapplicable to the facts of this case would have been considered seriously enough to have confused the jury. Adamcik offers no explanation as to why any reference to provocation is likely to have created sufficient jury confusion to constitute error, much less fundamental error, acknowledging that provocation was not at issue in this case. The references to provocation were plainly inapplicable to the facts at hand and there is no reasonable possibility that the jury would have found otherwise.

Adamcik next argues that the use of the phrase "abandoned and malignant heart" in J.I. 14 is vague and confusing, and the phrase is not contained in ICJI 702. The State argues that any initial confusion that the phrase may have caused would have been resolved in J.I. 15, paragraph 2, which states that malice aforethought exists where "[t]he defendant intentionally engaged in

conduct dangerous to another under circumstances which demonstrated an extreme indifference to the value of human life."

I.C. § 18-4002 is titled "Express and implied malice" and provides that "[s]uch malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." It is not an error to give jury instructions that mirror the language of the statute related to a crime. *Holland v. Peterson*, 95 Idaho 728, 518 P.2d 1190 (1974). Therefore, the reference to an "abandoned and malignant heart" did not constitute error.

Adamcik contends that J.I. 15 is inconsistent with ICJI 702 in a way which decreases the State's burden of proof. ICJI 702 states that malice may be implied where the "consequences of the act are *dangerous to human life*" and that act "was deliberately performed with knowledge of the danger to, and with *conscious disregard for, human life*." (emphasis added). In contrast, J.I. 15 states that malice aforethought may be found to exist where "the defendant intentionally engaged in conduct *dangerous to another* under circumstances which demonstrated an *extreme indifference to the value of human life*." (emphasis added).

Adamcik asserts that by requiring merely that an act be "dangerous to another," rather than "dangerous to human life," as required in ICJI 702, the court allowed the jury to find implied malice because Adamcik had committed an act dangerous to only the health of Stoddart, even where it did not constitute a danger to her life. The State argues that the only conduct Adamcik is alleged to have committed which would constitute murder under the theory advanced was the stabbing of Stoddart, which the jury could not reasonably have found to be dangerous to Stoddart's health but not her life. Adamcik responds that, under the arguments he has advanced, the jury could have found that Adamcik committed an act dangerous to Stoddart's health in purchasing knives or lying in wait. Since the jury could only have convicted Adamcik of first-degree murder by concluding that he actually stabbed Stoddart, and because it would be unreasonable to consider that conduct to be dangerous to Stoddart's health and not her life, the deviation from ICJI on this point was not an error.

Adamcik next contends that the State's burden was lowered where J.I. 15 requires only that the circumstances of the act in question demonstrated an "extreme indifference to the value of human life," whereas ICJI 702 requires that the act be performed "with knowledge of the

danger to, and with conscious disregard for human life." The State responds that there is no meaningful difference between these two articulations as, in order to demonstrate extreme indifference, a defendant must necessarily appreciate the danger to human life; one cannot be indifferent to something without being aware of it.

In *People v. Estrada*, the California Supreme Court examined the plain meaning of the phrase "reckless indifference to human life." 904 P.2d 1197 (Cal. 1995). The *Estrada* Court wrote:

> We . . . find that, when considered in its entirety — as the phrase is presented to the jury —"reckless indifference to human life" is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death. The common meaning of the term "indifference," referring to "the state of being indifferent," is that which is "regarded as being of no significant importance or value." (Webster's New Internat. Dict. (3d ed. 1981) p. 1151, col. 1.) To *regard* something, even to regard it as worthless, is to be aware of it. (See *id.* at p. 1911, col. 1 ["regard" is synonymous with "consider, evaluate, judge"].)
>
> Although the term "reckless" — standing alone — may arguably be understood in common parlance to mean simply neglectful, heedless, or rash (see Webster's New Internat. Dict., *supra,* at p. 1896, col. 1), when the word is placed in context within the statutory phrase "indifference to human life," what is conveyed to the jury is more than mere negligence.

*Id*. at 1202 (bracketed alterations in the original). The phrase "extreme indifference to the value of human life" is functionally equivalent to the phrase "reckless indifference to human life." We are therefore persuaded by the analysis of the California Supreme Court in *Estrada* and hold that in order to find that Adamcik had acted with "extreme indifference to the value of human life" he necessarily acted with "conscious disregard for human life" as required under ICJI 702.

We hold that the district court did not err in instructing the jury regarding malice, and the State's burden of proof was not lowered through such instruction.

5. The district court did not commit fundamental error by instructing the jury on a lying-in-wait theory of first-degree murder after the State had abandoned that theory.

Article I, section 8 of the Idaho Constitution states in relevant part that, "No person shall be held to answer for any felony or criminal offense of any grade, unless on presentment or indictment of a grand jury or on information of the public prosecutor . . . ." Where the charging terms of the Information or charging document have been altered, literally or in effect, a constructive amendment has occurred. *State v. Johnson*, 145 Idaho 970, 973, 188 P.3d 912, 915 (2008) (citing *United States v. Dipentino*, 242 F.3d 1090, 1094 (9th Cir. 2001)). A variance

requires a reversal only where "it deprives the defendant of his right to fair notice or leaves him open to the risk of double jeopardy." *State v. Windsor*, 110 Idaho 410, 417-18, 716 P.2d 1182, 1189-90 (1985). "Whether there is a variance or constructive amendment is a question of law over which this Court exercises free review." *Id*. at 972, 188 P.3d at 915.

Adamcik argues that the amended information in this case did not include a lying-in-wait alternative theory for finding Adamcik guilty of first-degree murder, yet J.I. 13 still retained such language. Adamcik again concedes that he did not object to J.I. 13 before the trial court, but that this Court should nevertheless consider this error as it constitutes fundamental error. The State acknowledges that the amended information did not allege that Adamcik had committed first-degree murder by lying in wait, but argues that there was no variance because lying in wait is merely a form of premeditation.

J.I. 13 reads:

In order for the Defendant to be guilty of First Degree Murder, the State must prove that the murder:
was perpetrated by lying in wait; or
was willful, deliberate and premeditated killing. Premeditation means to consider beforehand whether to kill or not to kill, and then to decide to kill. There does not have to be any appreciable period of time during which the decision to kill was considered, as long as it was reflected upon before the decision was made. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not premeditation.
If you unanimously agree that the State has proven any of the above special circumstances beyond a reasonable doubt, then you must find the Defendant guilty of First Degree Murder. If you unanimously agree that none of the special circumstances have been proven beyond a reasonable doubt, you ~~must~~ may find the defendant guilty of Second Degree Murder.
All other murder is murder of the second degree.

(strikethrough in the original).

Prior to 1977, I.C. § 18-4003 read, in part, "DEGREES OF MURDER. All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing is murder of the first degree." S.L. 1977, ch. 154, §2. Adamcik concedes that before 1977, lying in wait was merely listed as a specific example of the type of conduct that would constitute a willful, deliberate and premeditated killing. Adamcik argues that the change made in 1977 to I.C. § 18-4003 (now I.C. § 18-4003(a)) altered the meaning behind the inclusion of the term "lying in wait" because the word "other" was deleted from the phrase "or by any other kind of willful." Whether or not this interpretation is correct, it

40

is not reasonably likely that the jury found Adamcik guilty of lying in wait without also finding him guilty of killing in a willful, deliberate and premeditated fashion. As noted above, this Court considers the jury instructions as a whole in determining whether they fairly and accurately represent applicable law. *State v. Zichko*, 129 Idaho 259, 264, 923 P.2d 966, 971 (1996).

J.I. 13-A reads as follows:

> Any unlawful killing of a human being with malice aforethought is murder. If nothing further characterizes the killing, the murder is of the second degree. *To constitute the higher offense of murder in the first degree, there must be willfulness, deliberation and premeditation in addition to malice aforethought.*
> Willfulness means that there was manifested a clear intent to take life.
> Deliberation and premeditation means done with reflection and conceived beforehand and not done upon a sudden heat of passion or other condition precluding the idea of deliberation.

(emphasis added). Any confusion which may have been created by J.I. 13 is remedied in J.I. 13-A, where the jury is unequivocally informed that they must find willfulness, deliberation and premeditation in order to convict Adamcik of first-degree murder. Any error committed in including the instruction on lying in wait is harmless and, therefore, necessarily not fundamental.

**D. Closing Arguments.**

1. Standard of Review

Where prosecutorial misconduct was not objected to during trial, this Court may only reverse when that misconduct constitutes a fundamental error. *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). A defendant's right to a fair trial, under the Fourteenth Amendment of the United States Constitution, is violated where a prosecutor attempts to "have a jury reach its decision on any factor other than the law as set forth in the jury instructions and the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence." *Id*. Whether the trial court committed fundamental error is determined by the three-part *Perry* test set out above.

2. The State did not commit fundamental error during closing arguments.

Adamcik argues that the State committed the following errors at closing argument: (1) appealing to the sympathy of the jurors toward the victim and her family; (2) misstating the law and evidence; (3) shifting the burden of proof and improperly vouching for its experts; and (4) quoting the biblical commandment that "thou shalt not kill" in an attempt to inflame the jury. These arguments shall be examined in turn.

41

*i. The State improperly appealed to the jury's sympathy for Stoddart and her family, but this did not constitute fundamental error.*

During closing arguments, one of the prosecutors said the following:

Cassie Jo Stoddart was born December 21st, 1989. On September 22nd, 2006, this defendant brutally and viciously murdered her. She was sixteen years old, ladies and gentlemen. Sixteen years old.

Pictures such as this and fading memories are all that her family has left of her. They'll never see her graduate. They'll never see her get married. They'll never see her have children. They'll never see her grow old. They will never see her reach any of the great milestones—any of the great achievements that she may have achieved throughout her life.

Why? One reason. This defendant and Brian Draper wanted to be famous. They wanted to be famous, ladies and gentlemen. . . .

Adamcik argues that this appeal to the jurors' sympathy for Stoddart's family was an impermissible and inflammatory tactic, seeking to influence the jury to reach its decision through emotion rather than reason. *See*, *e.g.*, *State v. Phillips*, 144 Idaho 82, 87, 156 P.3d 583, 588 (Ct. App. 2007) (noting that "appeals to emotion, passion or prejudice of the jury through use of inflammatory tactics are impermissible").

In *State v. Severson*, this Court noted that:

It is generally recognized that a prosecutor may not comment on the victim's family during closing argument in order to appeal to the sympathies of the jury. Such extraneous statements are considered improper because their only purpose is to encourage the jury to identify with the victim. Whether such comments constitute fundamental error, however, must be considered in the context of the entire trial.

147 Idaho 694, 720, 215 P.3d 414, 440 (2009) (internal citations omitted). In *Severson*, the prosecutor offered the following statements in closing rebuttal: "Mary Severson isn't a decedent. Mary Severson was the 35-year-old mother of two boys. Mary Severson was the daughter of Carol Diaz. Mary Severson was the sister of Maria Gray. Mary Severson's life had purpose, and it had meaning. Your duty today is to give her death justice." *Id*. The prosecutor additionally made reference to Severson having spent her last Christmas with her family. *Id*. The *Severson* Court found that these statements by the prosecution, although arguably improper, did not amount to fundamental error for several reasons: (1) the statements were not dwelled upon or made in support of an argument that the defendant receive a harsher sentence; (2) the statements merely reiterated evidence offered previously during the trial; and (3) the district court had instructed the jury on several occasions that the prosecutor's closing statements were not to be

regarded as evidence. *Id*. This Court found that for these reasons the statements did not impact the fairness of the trial or deprive the defendant of due process. *Id*.

Here, like in *Severson*, the statements in question were not made or dwelled upon in support of a harsher punishment. Nor was any new evidence presented to the jury. Although the district court had not repeatedly emphasized to the jury that it should not consider the prosecutors' closing statements to constitute evidence, it had stated this once and included it in the jury instructions.[10] Looking at the evidence presented as a whole, it cannot be said that Adamcik has shown that there is a reasonable possibility that the verdict would have differed had this error not occurred. If the evidence presented did not convince the jury, it is highly unlikely that the jury's sympathy for Stoddart and her family would have changed its mind. Therefore, we find that the prosecutors' appeal to the jurors' sympathy for Stoddart's family was harmless and, thus, did not constitute fundamental error.

*ii. The State did not misstate the law and evidence*.

During closing arguments the prosecution made reference to the BRC tape and quoted Draper as having said, "We just killed Cassie." Adamcik argues that this is a misstatement and misrepresentation of the evidence presented, as the BRC tape cuts in midway through Draper's sentence and only states "—just killed Cassie." The State responds that both Detective Thomas and Detective Hamilton testified at trial that, in watching the BRC tape, they heard Draper say, "We just killed Cassie." The State argues that, as this evidence had been presented during trial, it was not erroneous for the prosecution to repeat it during closing argument.

"It is plainly improper for a prosecutor to mischaracterize the evidence adduced at trial." *State v. Contreras-Gonzales*, 146 Idaho 41, 49, 190 P.3d 197, 205 (Ct. App. 2008). The first word that can be heard on the relevant portion of the DVD copy of the BRC tape that has been provided to this Court is "just." Detectives Thomas and Hamilton testified that they heard Draper say "*we* just killed Cassie" based on their viewing of the original tape. It appears from watching the DVD copy that the prosecutor may have misstated what Draper said on the BRC tape. However, even if this were the case, it would not amount to fundamental error.

The jury was provided with the actual BRC tape during its deliberations, and it was played during trial. In addition, the jury heard Adamcik's attorney, during closing argument,

---

[10] Jury Instruction 2 stated, in relevant part, that "[t]he arguments and remarks of the attorneys involved in this case are intended to help you in understanding the evidence and applying the instructions, but they are not themselves evidence."

offer his opinion that Draper only said "just killed Cassie" and counsel strongly encouraged the jury to carefully listen to the BRC tape. Where the closing statement was consistent with testimony offered during the trial, and where the jury was provided with the actual exhibit in question, it cannot be said that Adamcik has demonstrated a reasonable possibility that any error here affected the outcome of the trial. Therefore, even if an error occurred here, it was harmless.

> *iii. The State did not improperly vouch for its experts or attempt to shift the burden of proof.*

Adamcik first argues that the prosecution improperly vouched for its experts in telling the jury that "the investigators did the best job they could." In *State v. Porter*, this Court noted that "a prosecutor should avoid expressing a personal belief as to the credibility of a witness unless the comment is based solely on inferences from evidence presented at trial." 130 Idaho 772, 786, 948 P.2d 127, 141 (1997). Here the prosecution stated its opinion, based on the evidence in the record, that the investigators in the case had conducted the best investigation that they could under the circumstances. The prosecutor did not offer an opinion as to the credibility of any witness. As this statement is not vouching testimony, we find no error here.

Adamcik next argues that the prosecution attempted to shift the burden of proof to the defense by arguing that the defense experts could have tested various pieces of evidence, which implicitly suggests that the burden was on the defense to do so. During closing, in the context of discussing the expert testimony offered by Adamcik's experts, the prosecution stated that:

> all of these items, including the photos Mr. Rammell showed you, of the droppings in the hallway were available to the defense to be tested the same as they were to the State. We felt that it wasn't important enough to present that sort of evidence to you.
>
> They could have tested Cassie's clothes. They could have tested those blood drops in the hallway. They could have tested the other knives that are in evidence. They could have tested the other shirt, the other pair of gloves, and all of the other items that were in evidence. And they chose not to do that.

Adamcik contends that these statements suggested that Adamcik had the burden of proof to demonstrate his innocence by testing the evidence and, therefore, was a misstatement of the law.

In *United States v. Vaandering*, the Ninth Circuit Court of Appeals held that, so long as the prosecution does not draw attention to the defendant's failure to testify, it may comment on the defendant's failure to present exculpatory evidence. 50 F.3d 696, 701 (9th Cir. 1995). "Furthermore, comments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof to the defendant where the prosecutor does not argue that a failure to explain

44

them adequately requires a guilty verdict and reiterates that the burden of proof is on the government." *Id*. at 701–02.

Here, the prosecution never stated that Adamcik had the responsibility to test evidence and bring forth the results, nor did it draw attention to his failure to testify, it merely responded to statements made in closing by Adamcik's counsel regarding the State's failure to test certain evidence. In fact, later in rebuttal the prosecutor reminded the jury that the State had the burden of proving each element of the crimes charged beyond a reasonable doubt. As Adamcik's counsel broached the subject of the State's failure to forensically test some of the evidence, it is fair advocacy for the State to note that the defense also failed to test such evidence. Therefore, no error occurred here.

*iv. The State's reference to the Bible did not constitute fundamental error.*

Adamcik contends that the prosecutor impermissibly tried to inflame the jury by quoting the biblical commandment, "Thou shalt not kill." The BRC tape was played by the State at trial, and on the tape Adamcik made comments to the effect that evil is a societal construct and murder is only wrong because it is against the law. Defense counsel questioned Shannon Adamcik about this videotape, and asked her whether Adamcik was an atheist; Shannon replied that he was not. When asked how she knew that Adamcik was not an atheist Shannon answered "because we do have Bible studies. We have done that with the kids ever since we were—we say prayers. We bless our food and go to church. He's just not an atheist." The State argues that defense counsel opened the door to the discussion of religion both through this exchange and through the following statements made by defense counsel during closing:

> Even the atheism comment on there, listen to it. That's probably as disturbing as anything to me when I first saw it because, frankly, think about it. If you can believe that someone doesn't believe in God and they don't have any morals in that sense, then they can do something horrible like that—but you heard Shannon Adamcik testify. Did you believe her on that? Do you believe that they had a Bible study? Do you believe they do those things and pray? They do.

In the context of his surrounding remarks, it is clear that defense counsel was attempting to support his theory that Adamcik believed he was only making a movie, and that his statements were merely following Draper's lead. In rebuttal, the prosecution stated:

> Mr. Pearson talked to you about that little tirade that the defendant went on about whether or not Murder should be legal or illegal, and it shouldn't be against the law, and the only reason it is, is to prevent people from doing things, but it makes people want to do it even more if you try to prohibit them.

45

In our system, in our society, Murder is wrong.  It's ethically wrong, it's morally wrong, and it's against the law.  Torey Adamcik may have been smart—and he was—he did a lot of things to try and cover up this crime and to try and prevent the police from finding out it was him that did it, but he wasn't smart enough to remember one simple phrase, and that is, "Thou shalt not kill."

A guilty verdict on both of these counts for Torey Adamcik will tell him that—"Thou shalt not kill."

The prosecution's closing rebuttal began by referencing Adamcik's remarks on the videotape, but arguably went beyond the scope of an appropriate response. Nonetheless, the remark was made in the context of defense counsel's reference to Adamcik's Bible study and to the BRC tape.  When viewed in context, the prosecutor's comments cannot reasonably be construed as having been made principally to inflame the jurors, and we therefore decline to find them in error.

**E.  The cumulative error doctrine does not necessitate a reversal**.

Adamcik contends that the cumulative error doctrine applies here, necessitating a reversal of his convictions. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial. However, a necessary predicate to the application of the doctrine is a finding of more than one error." *Perry*, 150 Idaho at 230, 245 P.3d at 982. Adamcik cites six alleged errors that, when aggregated, acted to deprive him of a fair trial. Five of the alleged errors—failure to suppress the entirety of his interview and four instructional errors—have been determined by this Court not to have been in error. The sixth claim of error relates to the prosecutor's closing argument. Although the appeal to the jury's sympathy is of concern, Adamcik has failed to demonstrate at least two errors, a necessary predicate to the application of our cumulative error doctrine.

**F.  The district court did not abuse its discretion in sentencing Adamcik to a fixed life sentence for first-degree murder and a unified life sentence with thirty years fixed for conspiracy to commit first-degree murder, nor did the district court abuse its discretion in denying Adamcik's Rule 35 motion for a sentence reduction.**

1.  Standard of Review

As this Court provided in *State v. Stevens*:

The Court, when conducting its review of a defendant's sentence, considers the entire length of the sentence under an abuse of discretion standard to determine its reasonableness.  Where a sentence is within the statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion.  In examining the reasonableness of a sentence, the Court conducts an independent review of the entire record available to the trial court at sentencing, focusing on

the objectives of criminal punishment: (1) protection of society; (2) deterrence of the individual and the public; (3) possibility of rehabilitation; and (4) punishment or retribution for wrongdoing. "Reasonableness" of a sentence "implies that a term of confinement should be tailored to the purpose for which the sentence is imposed." *State v. Broadhead,* 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown,* 121 Idaho 385, 394, 825 P.2d 482, 491 (1992). In deference to the trial judge, this Court will not substitute its view of a reasonable sentence where reasonable minds might differ. To show an abuse of discretion, the defendant must show that the sentence, in light of the governing criteria, is excessive under any reasonable view of the facts.

146 Idaho 139, 148-49, 191 P.3d 217, 226-27 (2008) (internal citations omitted). However, the imposition of a fixed life sentence "requires a high degree of certainty that the perpetrator could never be safely released back into society or that the nature of the offense requires that the individual spend the rest of his life behind bars." *Id*. at 149, 191 P.3d 227 (quoting *State v. Cross*, 132 Idaho 667, 672, 978 P.2d 227, 232 (1999)).

2. Adamcik has not shown a clear abuse of discretion by the district court.

Adamcik argues that the district court abused its discretion in sentencing him to fixed life for first-degree murder and unified life with 30 years fixed for conspiracy to commit first-degree murder. Adamcik argues that the sentence imposed by the district court was an abuse of discretion for three reasons: (1) it is impossible to tell that a juvenile is so lacking in rehabilitative potential that imprisonment until death is the only way to protect society; (2) imposing fixed life solely based on the nature of the offense, without consideration of the nature of the offense and the character of the offender, violates established sentencing principles; and (3) the egregiousness of Adamcik's offense is lessened by his immaturity and diminished capacity.

The State points out that the Idaho Court of Appeals in *State v. Eubank* stated that "a fixed life sentence may be deemed reasonable if the offense is so egregious that it demands an exceptionally severe measure of retribution and deterrence, *or* if the offender so utterly lacks rehabilitative potential that imprisonment until death is the only feasible means of protecting society." 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct. App. 1988). In other words, even if the district court were uncertain about Adamcik's rehabilitative potential, it could nevertheless impose a sentence of fixed life if it found the offense sufficiently egregious.

The district court provided a clear articulation for the reasons it decided to sentence Adamcik to an indeterminate life sentence, with 30 years fixed, for conspiracy to commit first-

degree murder, and fixed life for first-degree murder. The court discussed the seriousness of the offense, stating "the nature of the offense here you've both committed is, of course, the most serious we have in our society." The district court considered the evidence Adamcik's experts offered as to his mental capacity and potential for rehabilitation, but ultimately concluded beyond a reasonable doubt, after reviewing all the evidence, that Adamcik would kill again if released.

In *State v. Windom*, this Court recently upheld the determinate life sentence of a minor, based solely upon the nature and gravity of the offense. 150 Idaho 873, 253 P.3d 310, 314 (2011). Windom was a 16-year-old who had been convicted and sentenced to fixed life for the second-degree murder of his mother. *Id.* at 875, 253 P.3d at 312. On appeal, the Court considered whether the district court had abused its discretion in sentencing Windom to fixed life and concluded that the severe and egregious nature of the crime was sufficient on its own to justify the fixed life sentence. *Id*. at 880-84, 253 P.3d at 317-18.

The circumstances of the case at hand share commonalities with those present in *Windom*. Both Adamcik and Windom were approximately the same age at the time they committed their crimes. Both shared an unhealthy obsession with fictionalized violent serial killers. Both brutally murdered people close to them without the slightest provocation. In light of the excessively heinous nature of the crime committed here, the premeditated and calculated stabbing of a friend for the apparent purpose of gaining fame as a serial killer, this Court finds that Adamcik has failed to demonstrate a clear abuse of discretion by the district court. It is unnecessary for this Court to examine Adamcik's potential for rehabilitation.

### 3. The district court did not abuse its discretion in denying Adamcik's Rule 35 motion.

As this Court stated in *State v. Farwell*:

> Rule 35 is a narrow rule which allows a trial court to correct an illegal sentence or to correct a sentence imposed in an illegal manner. Generally, whether a sentence is illegal or whether it was imposed in an illegal manner is a question of law, over which we exercise free review. However, if the basis for the illegality of the sentence is that the sentence is excessive, and the sentence is within the statutory limits, a motion for reduction of sentence under Rule 35 is a plea for leniency, and this Court will then review a denial or grant of the motion for an abuse of discretion. "When presenting a Rule 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the district court in support of the Rule 35 motion. An appeal from the denial of a Rule 35 motion cannot be used as a vehicle to renew the underlying sentence absent the presentation of new information."

48

144 Idaho 732, 735, 170 P.3d 397, 400 (2007) (internal citations omitted) (quoting *State v. Huffman*, 144 Idaho 201, 203, 159 P.3d 838, 840 (2007)).

Adamcik presented no new information pertaining to his sentence for either offense so as to invoke Rule 35. He argues that he presented additional evidence in the form of an audiotape where Draper allegedly takes responsibility for the "Black River Story." Adamcik argues that because the district court took into consideration his belief that Adamcik was involved in writing the Black River Story in determining that a fixed life sentence was appropriate, this new information should change that determination. However, even if we accept Adamcik's argument, we still cannot find an abuse of discretion by the district court in denying his Rule 35 motion.

**G.    Adamcik's life sentence does not constitute cruel and unusual punishment under Article I, section 6 of the Idaho Constitution.**

1.  Standard of Review

Our standard of review for claims of cruel and unusual punishment under Article I, section 6 of the Idaho Constitution was concisely summarized by this Court in *State v. Grazian* as follows:

> When reviewing a claim of cruel and unusual punishment the Court uses a proportionality analysis limited to cases which are out of proportion to the gravity of the offense committed. The Court compares the crime committed and the sentence imposed to determine whether the sentence is grossly disproportionate. This gross disproportionality test is equivalent to the standard under the Idaho Constitution which focuses on whether the punishment is so out of proportion to the gravity of the offense to shock the conscience of reasonable people. An intra- and inter-jurisdictional analysis is appropriate only in the rare case where the sentence is grossly disproportionate to the crime committed.

144 Idaho 510, 517, 164 P.3d 790, 797 (2007) (internal quotations and citations omitted). "Where reasonable minds might differ as to the sufficiency of time of confinement, the discretion vested in the sentencing court in imposing sentence will be respected." *State v. Broadhead*, 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled* on other grounds by *State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992).

2.  Adamcik's fixed life sentence does not constitute cruel and unusual punishment in light of his conviction for first-degree murder.

Adamcik argues that his fixed life sentence shocks the conscience of reasonable people, and is thus cruel and unusual punishment under Article I, section 6 of Idaho's Constitution. Adamcik argues that the cruel and unusual nature of his sentence is demonstrated by: (1) the international rejection of fixed life sentences for juvenile offenders; and (2) the

disproportionality between his fixed life sentence, on the one hand, and the lesser sentences given to other juveniles convicted of first-degree murder in Idaho, on the other. In support of his disproportionality claim, Adamcik incorrectly states that Idaho has never upheld a fixed life sentence for a juvenile offender. However, as noted above, a fixed life sentence for a minor was just recently upheld in *State v. Windom*.

Conversely, the State argues that Adamcik's sentence does not constitute cruel and unusual punishment because Adamcik has failed to show that a gross disproportionality exists between his sentence and his crimes. The State adheres to the notion that a fixed life sentence is appropriate for an offender convicted of first-degree murder. The State does not address whether Adamcik's status as a juvenile is relevant in determining whether a gross disproportionality exists.

In *State v. Brown*, this Court adopted the cruel and unusual punishment test proposed by Justice Kennedy in his concurrence in *Harmelin v. Michigan*, 501 U.S. 957 (1991) (Kennedy, J., concurring), requiring courts to "make a threshold comparison of the crime committed and the sentence imposed to determine whether the sentence leads to an inference of gross disproportionality," thus rendering it unconstitutional. 121 Idaho 385, 394, 825 P.2d 482, 491 (1992).

To determine whether a sentence is cruel and unusual, this Court engages in a two-part inquiry. First, this Court must "make a threshold comparison of the crime committed and the sentence imposed to determine whether the sentence leads to an inference of gross disproportionality." *Brown*, 121 Idaho at 394, 825 P.2d at 491. Where no inference of a gross disproportionality can be made, "there is no necessity to make any further proportionality review." *Id.* at 394, 825 P.2d at 491. However, "[i]f an inference of such disproportionality is found, [the Court] must conduct a proportionality analysis comparing [the defendant's] sentence to those imposed on other defendants for similar offenses." *State v. Olivera*, 131 Idaho 628, 632, 962 P.2d 399, 403 (Ct. App. 1998).

In *State v. Thomas*, the defendant was sentenced to fixed life after she pled guilty to the murder of her ailing boyfriend, as well as illegally collecting money from his social security and pension funds for eleven years following the murder. 133 Idaho 682, 685-88, 991 P.2d 870, 873-76 (Ct. App. 1999). While analyzing Thomas's cruel and unusual punishment claim, the Idaho Court of Appeals found that because "Thomas and her son premeditated the heartless and greed-

motivated murder of her ailing seventy-three year old boyfriend . . . [her] sentence [was] not grossly disproportionate to her crime and does not shock the conscience of reasonable people." *Id.* at 687, 991 P.2d at 875. Consequently, the court found that it was "not necessary to conduct any further proportionality review" because no disproportionality existed. *Id.*

Likewise, in *State v. Brown,* where the defendant "forced a female employee into a back room, beat her on the head with a brick, raped her, stabbed her twice in the chest with a knife, and cut her throat," this Court upheld Brown's fixed life sentence even though the victim survived the incident. 121 Idaho 385, 394, 825 P.2d 482, 491 (1992). Addressing Brown's cruel and unusual punishment claim, this Court stated that "[t]he gravity of the offense in this case was very great. Brown not only raped the victim but almost killed her." *Id.* at 394, 825 P.2d at 491. This court went on to "conclude that Brown's sentence is not out of all proportion to the gravity of the offense, nor is the sentence so severe as to shock the conscience of reasonable people." *Id.* Thus, in *Brown* "there [was] no necessity to make any further proportionality review." *Id.*

Similarly, in *State v. Shanahan*, the court found that concurrent unified life sentences for a juvenile appellant who perpetrated a "premeditated and cold-blooded" murder were not out of proportion to the gravity of the offense committed such as to shock the conscience of reasonable people. 133 Idaho 896, 900, 994 P.2d 1059, 1063 (Ct. App. 1999). The appellant in *Shanahan* entered a convenience store and snuck down the aisles until he stood behind the clerk; he then raised his gun and fired, killing the clerk. *Id.* at 898, 994 P.2d at 1061. Shanahan then removed money from the cash register and left. *Id.* The court found that a proportionality review was not necessary given that no inference of a gross disproportionality existed. *Id.* at 900, 994 P.2d at 1063.

Adamcik's fixed life sentence does not constitute cruel and unusual punishment under Article I, section 6 of Idaho's Constitution because no gross disproportionality exists in this case. Adamcik conspired, carefully planned and executed the cold-blooded stabbing death of his fellow high school student, Stoddart, based solely on his desire to achieve fame as a serial killer. Like the heinous crimes committed by the defendants in *Thomas* and *Brown*, whose fixed life sentences were upheld on appeal, the gravity of the first-degree murder that Adamcik committed supports the severity of his fixed life sentence. Furthermore, the fact that Adamcik's fixed life sentence falls within the sentencing parameters set out in I.C. § 18-4004 (entitled "Punishment

for murder") indicates that no disparity exists between the sentence imposed by the trial court and the gravity of Adamcik's crime.

Because we do not find the existence of a gross disproportionality, we decline to consider any of Adamcik's proportionality arguments because "intra and inter-jurisdictional" analysis is only proper where the Court makes an initial finding that a gross disproportionality exists. *State v. Matteson,* 123 Idaho 622, 626, 851 P.2d 336, 340 (1993). Adamcik's argument that this Court should find his sentence to be cruel and unusual due to Adamcik's minority and the growing international rejection of life imprisonment for minor offenders is without merit. This Court has never held that extra-jurisdictional international conventions shall be considered in any way in interpreting and applying the Idaho Constitution. Adamcik's sentence comports with Article I, section 6 of Idaho's Constitution and is not cruel and unusual.

# IV.
## CONCLUSION

We hold that: (1) the jury was provided with sufficient evidence from which it could reasonably find beyond a reasonable doubt that Adamcik was guilty of murder in the first degree; (2) the district court did not err in denying, in part, Adamcik's motion to suppress; (3) even if errors were committed in providing jury instructions, those errors were harmless; (4) the prosecution committed no fundamental error in closing arguments; (5) the doctrine of cumulative error does not necessitate a reversal; (6) the district court did not abuse its discretion in sentencing Adamcik; (7) the district court did not abuse its discretion in denying Adamcik's Rule 35 motion; and (8) Adamcik's sentence does not constitute cruel and unusual punishment under the Idaho Constitution. Adamcik's convictions and sentences are therefore affirmed.

Justices EISMANN CONCURS.

Justice W. JONES, specially concurring:

I concur in the Court's Opinion, but write separately in order to reconcile my dissent in *State v. Windom*, 150 Idaho 873, 253 P.3d 310 (2011), with the Court's holding here in Section III.F.2 affirming Adamcik's fixed-life sentence. In *Windom*, I stated that the district court abused its discretion when it imposed a fixed-life sentence on a sixteen-year-old with a severe mental illness because an offender's individual characteristics are relevant to the reprehensibility of a crime, contrary to the majority's holding that these individual characteristics need not be

52

taken into consideration in determining reprehensibility. 150 Idaho at 884–85, 253 P.3d at 321–22. As I explained there, "[a] crime is less reprehensible—and therefore potentially less deserving of severe retribution—if the criminal has personally mitigating circumstances." *Id.* at 884, 321. The Court here analogizes this case to *Windom* and holds, consistent with the majority in *Windom*, that the nature of the crime alone is sufficient to support the fixed-life sentence. Under the facts of this particular case, I agree with the Court's conclusion affirming the fixed-life sentence, but not its rationale.

The district court's imposition of a fixed-life sentence here is consistent with my dissent in *Windom* because, given Adamcik's individual characteristics, the reprehensibility of this crime fully supports the fixed-life sentence. There are substantial and important differences between the facts of *Windom* and this case. The one main similarity between the two cases is that both Adamcik and Windom were 16 years old and committed murder in a particularly heinous way: Adamcik by stabbing a friend to death with a knife and Windom by beating his mother to death with a dumbbell. However, other than their respective ages at the time the crimes were committed, I do not find parallels in their individual characteristics such that I believe the district court abused its discretion in imposing a fixed-life sentence on Adamcik. Windom, on the other hand, had a psychotic disorder, paranoid schizophrenia, which *caused* him to kill his mother. *Id.* at 885–86, 322–23. Adamcik had no such psychotic disorder. The only evidence here relates to personality disorders, not psychosis. The record indicates that Adamcik was "immature" and that he may have had Attention Deficit Hyperactive Disorder and a learning disability, but there was no suggestion this *caused* him in any way to murder Stoddart. Adamcik's doctor testified that Adamcik did not have any "pathological drive or pathological desire that he would personally harbor, that would have led him to these offenses," and that there was no evidence of sociopathy.

Rather, as shown in Adamcik and Draper's video tape, the evidence shows that Adamcik murdered Stoddart in an attempt to achieve fame in the same manner as the Columbine killers. While it is true that Windom had a similar obsession with serial killers and violence, as I wrote in that case, "[t]here is no indication that Ethan's offensive actions, remorselessness, and grandiose statements were anything but his psychosis manifesting itself." *Id.* at 886, 323. The facts here simply do not indicate that a serious mental illness caused Adamcik to kill.

Also, in contrast to Adamcik, Windom reported his homicidal thoughts to authority figures and continually sought help weeks before the murder for his mental illness which was driving him toward violence and homicide. *Id.* at 886–87, 323–24. Adamcik on the other hand secretly plotted and planned the murder days before the killing, which was to be a tune-up or practice before other intended killings.

Because I believe that the reprehensibility of the crime fully supports the fixed-life sentence imposed here, I agree with the Court that there is no need to consider rehabilitation in this case, and that Adamcik's sentence was not an abuse of discretion and should be affirmed.


**BURDICK, C.J., dissenting** as to Part III.A.2 and concurring with Justice Horton's dissent on Part III.C. 2. I agree with the remainder of the majority opinion. My heart goes out to the Stoddart family, friends and the Pocatello community for having to deal with this especially senseless, horrible act, but I feel I must dissent.

Although I have no doubt that Adamcik could have been convicted of first-degree murder under either a felony-murder or aiding-and-abetting theory, had they been presented to the jury, I am unable to concur with the majority's finding that sufficient evidence was presented to the jury to support Adamcik's conviction of first degree murder based upon an aiding and abetting theory. Therefore, I respectfully dissent as to Part III.A.2 of the majority's opinion and with its decision affirming Adamcik's conviction for first-degree murder.

The jury was presented with no evidence as to the ordering of the stab wounds, nor the timeline over which they took place. Based upon the instructions given, when applied to the evidence presented, I cannot find that the jury reached its verdict, that Adamcik committed first-degree murder, upon substantial and competent evidence.

1. The State presented insufficient evidence to support a jury conviction that Adamcik was the direct perpetrator of first-degree murder.

The majority finds that there was sufficient evidence to support a jury finding that: (1) two knives were used to murder Stoddart; (2) both knives inflicted potentially fatal wounds; and (3) one of the knives was used by Adamcik to inflict a potentially fatal stab wound. It is questionable whether sufficient evidence is in the record to support a finding that Adamcik actually stabbed Stoddart, but assuming there was, these findings are insufficient to uphold the verdict entered.

Dr. Skoumal performed the autopsy in this case and testified that Stoddart's cause of death was "stab wounds to the trunk". The majority interprets that finding as necessarily indicating that multiple stab wounds caused Stoddart's death. However, in light of Dr. Skoumal's testimony as a whole, I find that Dr. Skoumal was testifying that he could not determine which particular wound(s) caused her death. On cross examination, Dr. Skoumal stated that the "cause of death is stab wound to the trunk" and then "[t]he cause of death was stabbing to the trunk; that's how it was done." This interpretation is consistent with Dr. Skoumal's overall testimony, in which he never identifies specifics about the manner of death, and only identifies certain wounds as "potentially fatal". Thus, Dr. Skoumal's testimony does not support a finding that Stoddart necessarily died of more than one stab wound but, rather, that one or more stab wounds caused her death.

There was no evidence presented supporting a conclusion that Adamcik inflicted a wound which caused, contributed to, or accelerated Stoddart's death. If Adamcik did not inflict a wound while Stoddart was still alive his conviction would be barred by the doctrine of legal impossibility. *See United States v. Hsu*, 155 F.3d 189, 199 (3d Cir. 1998) ("The common law distinguishes between two types of impossibility—legal and factual—and provides that the former is a defense while the latter is not. . . . For example, legal impossibility occurs when A shoots a corpse believing it to be alive and intending to commit murder; the attempt does not amount to murder even if completed."). Where Dr. Skoumal, who performed the autopsy on Stoddart, could not determine which wound was fatal, or how many wounds caused her death, I cannot find that there was substantial evidence supporting a jury finding that Adamcik inflicted a stab wound from which Stoddart died. Some wounds are described as "potentially fatal," each could have been fatal on its own, but Dr. Skoumal could not determine when each wound was inflicted. Furthermore, during cross-examination, the State's expert Dr. Garrison testified that, in his opinion, some of the wounds *were* inflicted post-mortem. Dr. Garrison noted that some of the wounds "would be potentially fatal, but it was my opinion the person was no longer viable and so, therefore, it would not have been a fatal wound under the circumstances. If you stab a person in the heart but if they're already dead, it's not a fatal wound."

2.  The jury could not have found Adamcik guilty of first-degree murder under an aiding-and-abetting theory where the State failed to argue that theory and the jury was not instructed on it.

55

Additionally, I wish to address the State's argument that Adamcik's conviction could be affirmed under an aiding-and-abetting theory of commission even though the jury was not instructed on that theory.

Idaho Code § 18-204 defines "principals" as:
All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed.

Idaho Code § 18-205 states:

All persons are accessories who, having knowledge that a felony has been committed: (1) Willfully withhold or conceal it from a peace officer, judge, magistrate, grand jury or trial jury; or (2) Harbor and protect a person who committed such felony or who has been charged with or convicted thereof.

Idaho Code § 19-1430 abolishes the distinction between principals and accessories before the fact, providing:

The distinction between an accessory before the fact and a principal and between principals in the first[11] and second[12] degree, in cases of felony, is abrogated; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, shall hereafter be prosecuted, tried, and punished as principals, and no other facts need be alleged in any indictment against such an accessory than are required in an indictment against his principal.

In *State v. Johnson*, this Court noted that "Idaho, consistent with many other jurisdictions, has abolished the distinction between principals and aiders and abettors, and instead treats aiding and abetting as a theory under which first-degree murder can be proved and not as a separate offense or a crime of a different nature." 145 Idaho 970, 973, 188 P.3d 912, 915 (2008).

The State argues that even if the evidence submitted was only sufficient to convict Adamcik under aiding-and-abetting (or accomplice) liability, he has failed to show that the district court's failure to instruct the jury on accomplice liability was fundamentally unfair. The State contends that, as Idaho has abolished the distinction between direct perpetrators and accessories, Adamcik's right to a fair trial could not have been violated where the evidence at trial was sufficient to support his conviction, regardless of the theory argued. Adamcik argues that the State did not contend at trial that Adamcik was guilty of first-degree murder by aiding

---

[11] A principal in the first degree is "[t]he perpetrator of a crime." Black's Law Dictionary 1312 (9th ed. 2009).
[12] A principal in the second degree is "[o]ne who helped the perpetrator at the time of the crime." Black's Law Dictionary 1312 (9th ed. 2009).

and abetting, nor was the jury instructed on this theory and, therefore, the jury could not have convicted Adamcik for aiding and abetting, but only for actually killing Stoddart.

The State argues that Adamcik never requested that the district court instruct the jury on aiding and abetting and has failed to show that the district court's failure to so instruct constituted fundamental error. The State's argument is misguided. It was the State's duty to request that the jury be instructed regarding a theory of aiding and abetting if the State wished the jury to consider that theory in its deliberations. The district court's failure to instruct the jury on aiding and abetting was neither fundamental error nor harmless error; it was no error at all. The State made a tactical decision to try Adamcik as a direct perpetrator of first-degree murder and not under an aiding-and-abetting theory. The jury heard no argument on an aiding-and-abetting theory and was not instructed on an aiding-and-abetting theory; therefore, it necessarily must have convicted Adamcik of committing first-degree murder as a direct perpetrator.

It is the most fundamental tenet of a fair trial that a defendant may only be convicted for the crimes with which he is charged, this Court may not affirm a conviction on a theory that was never presented to the jury. *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991). As the United States Supreme Court stated in *McCormick*:

> This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

*Id. See also De Jonge v. Oregon*, 299 U.S. 353, 362 (1937) ("Conviction upon a charge not made would be sheer denial of due process.") Therefore, we could not affirm Adamcik's conviction for first-degree murder on a theory of aiding and abetting.

Had the State charged Adamcik with attempted first-degree murder, first-degree murder under an aiding-and-abetting theory, or even felony murder, there is no doubt that substantial and competent evidence was presented that would have supported the jury's verdict. Recognizing that *State v. Johnson*, 145 Idaho 970, 974, 188 P.3d 912, 916 (2008), had not been released at the time of Adamcik's trial, under the reasoning of that decision the State could have requested aiding-and-abetting instructions at the close of its evidence, even though the Information against Adamcik did not allege a theory of aiding and abetting. However, by charging Adamcik solely with first-degree murder and failing to offer any direct or circumstantial evidence to support the jury's verdict that Adamcik actually inflicted a fatal stab wound, the State failed to present

sufficient evidence to support a finding that each element of first-degree murder as charged had been proven beyond a reasonable doubt. I must respectfully dissent as well as join Justice Horton's dissent. I agree with the remainder of the majority's opinion.

HORTON, J., concurring in part and dissenting in part.

I join in Chief Justice Burdick's dissent from Part III.A.2 of the Court's opinion. I also dissent from Part III.C.2. Although I would vacate Adamcik's sentence for first degree murder, I agree with the reasoning advanced in the remainder of the Court's opinion.

I will approach the two sections of the opinion from which I dissent in a different sequence than did the majority. I do so because the issue of the sufficiency of the evidence presented at trial to support the verdict is defined by the question presented to the jury for its determination. My disagreement with the majority flows from my conviction that this Court may not evaluate the sufficiency of the evidence presented at trial on a theory upon which the jury was not instructed.

The majority's opinion does not contain an explicit statement of the premises upon which it rests. A careful reading of the majority's decision regarding the sufficiency of the evidence and the discussion relating to J.I. 10 and J.I. 12 reveals that the decision ultimately rests upon the following premises: (1) a jury need not be "expressly" instructed as to the law of principal liability based upon a theory of aiding and abetting another in the commission of a crime; and (2) this Court may disregard the instructions that the jury *was* provided which articulate the theory upon which the defendant was charged and view the sufficiency of the evidence as to a theory upon which the defendant *may* have been charged and for which jury instructions *would have been* appropriate. In accepting these premises, I believe that the majority has overstepped its appellate role and assumed the duties of the trier of fact. For that reason, I believe that my fellow dissenter has properly quoted Justice White's statement in *McCormick v. United States*, 500 U.S. 257 (1991):

> This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

*Id*. at 270 n. 8.

**Part III.C.2**

I agree with the proposition advanced by the majority that a prosecutor's information does not have to allege that a defendant aided and abetted another in the commission of a crime. Indeed, this is a proposition that this Court has consistently accepted for more than sixty years, beginning with the decision in *State v. Ayres,* 70 Idaho 18, 27-28, 211 P.2d 142, 147 (1949) ("he is presumed to know that he would be a principal and guilty as such whether he directly committed the acts charged or aided and abetted in the commission by another") through our most recent decision on the subject in *State v. Shackelford*, 150 Idaho 355, ___, 247 P.3d 582, 605-06 (2010) (rejecting defendant's claim of error in giving aiding abetting instruction due to absence of allegation in indictment that defendant aided and abetted another).

However, I do not view the critical issue presented in this appeal (at least as it relates to the conviction for first degree murder) as whether Adamcik's due process rights were implicated. Rather, the related questions are (1) What charge did the jury receive? and (2) Does the majority's holding violate Adamcik's right to trial by jury?

The majority concludes Part III.C.2 with the following statement:

> Certainly, the jury in this case understood the State's theory that Adamcik and Draper acted in concert to murder Stoddart: that Adamcik planned the murder; that he lay in wait with Draper to help carry out the murder; and that he inflicted at least one stab wound that could have killed Stoddart. These theories of first-degree murder are adequately described in the jury instruction provided in this case by requiring that the jury find that Adamcik engaged in conduct which caused Stoddart's death.

I do not agree that the instructions may reasonably be interpreted as instructing the jury as to the State's theory that "Adamcik planned the murder; that he lay in wait with Draper to help carry out the murder; and that he inflicted at least one stab wound that could have killed Stoddart." Rather, as the majority recognizes, "[t]he only conduct that the jury was instructed on regarding first-degree murder" is found in J.I. 10, which set forth the charging language of the information.

J.I. 10 alleged that Adamcik murdered Stoddart "by purchasing knives and stabbing Cassie Stoddart from which the victim died in Bannock County, Idaho." I agree with the majority's conclusion that the reference to "purchasing knives" is mere surplusage. Thus, the only theory of murder upon which the jury was instructed is that Adamcik engaged in the conduct of "stabbing Cassie Stoddart from which the victim died." Although the jury

59

undoubtedly understood that the State's evidence showed that "Adamcik planned the murder; that he lay in wait with Draper to help carry out the murder; and that he inflicted at least one stab wound that could have killed Stoddart," the jury was simply not instructed on these theories of liability.

The charge of first degree murder set forth in the Information did not allege that Adamcik planned the murder, nor did it allege that he lay in wait with Draper to help carry out the murder, nor did it allege that Adamcik inflicted at least one stab wound that could have killed Stoddart. Rather, the State elected to charge Adamcik as *the* person who slayed Cassie Jo Stoddart, alleging that he murdered Stoddart by "stabbing Cassie Stoddart from which the victim died."[13] The instructions given by the district court reflected the theory upon which the State elected to charge Adamick with first degree murder. For that reason, I am deeply troubled by the majority's certainty that "the jury in this case understood the State's theory that Adamcik and Draper acted in concert in the commission of this murder. . . ." Although the jury may well have intuited that one who participates in a killing may be accountable for that act, it is undisputed that the district court did not instruct them as to the law governing the principal liability of an aider-and-abettor. The majority's statement appears to disregard this Court's oft-stated presumption that a jury follows the instructions they have received. *See e.g. Phillips v. Erhart*, 151 Idaho 100, ___, 254 P.3d 1, 10 (2011). Instead, the majority appears to presume that the jury disregarded the instructions they were given in order to reach "the right result" based upon the evidence presented at trial.

The majority, when discussing the adequacy of the jury instructions, states: "[A]s discussed at length in Part III.A.2, the State need not prove Adamcik inflicted *the* fatal wound, or any wound, so long as it proved he was an accomplice in Stoddart's killing." This statement ignores the fact that the only "conduct which caused the death of Cassie Jo Stoddart" which was the subject of instruction is that contained in the Information.

---

[13] The State's election to charge Adamcik as the individual who stabbed Stoddart to death is inexplicable, inasmuch as the State had previously persuaded a jury beyond a reasonable doubt that Brian Draper murdered Stoddart by "stabbing Cassie Stoddart from which the victim died." (Although it is not part of the record in this appeal, before Adamcik's trial, Brian Draper was convicted of first degree murder for his role in Stoddart's slaying. The language in the information setting forth the charge of first degree murder in that case was identical to that used in this case, save for the identity of Stoddart's alleged killer.) I take it as a given that a person may be murdered only one time. Thus, I am utterly baffled by the State's decision not to request an instruction relating to Adamcik's liability as a principal for aiding and abetting Draper in the commission of the murder.

Although the majority relies on *Ayres* and *State v. Owen*, 73 Idaho 394, 253 P.2d 203 (1953), in its discussion of the sufficiency of the evidence that Adamcik aided and abetted in Stoddart's killing (which is incorporated into its analysis of the jury instructions in Part III.C.2), neither of these cases stands as precedent for the proposition that the jury charge need not articulate the grounds upon which a defendant may be found liable as a principal for the criminal acts of another.

In *Ayres*, this Court upheld a conviction for involuntary manslaughter in a case where the jury found that another, Arthur Trautman, was the driver at the time of a head-on collision which killed five people, including Trautman. This Court found that sufficient evidence supported the defendant's conviction as a principal on a theory of aiding and abetting, 70 Idaho at 27-28, 211 P.2d at 147, although the information charged that Ayres "did wilfully, unlawfully, and feloniously drive and operate said motor vehicle.…" *Id.* at 24, 211 P.2d at 144-45. However, it is significant that the jury was explicitly charged in the jury instructions as to the legal theory upon which Ayres could be found guilty of the charge, even if he were not the driver.[14]

In *Owen*, two defendants (Owen and Hastings) appealed their convictions and sentences for first degree murder, arising from the shooting death of Bert McCurry, the owner and operator of a grocery store, in the course of a robbery. 73 Idaho at 400, 253 P.2d at 205-06. The majority quotes a small portion of the *Owen* decision and concludes that "Defendants acting in concert are thus equally guilty of the crime charged." The majority fails to note that the jury was

---

[14] A review of the record in the *Ayres* case reveals that the jury received the following instruction:

> Secondly, I instruct you that if the owner of a dangerous instrumentality like an automobile knowingly puts that instrumentality into the immediate control of a careless and reckless driver, and sits by his side, without protesting, while such driver violates a statute or statues [sic] governing the driving of automobiles on the highways of this state, such owner is equally responsible with the driver if the latter's violation of the law is the cause of the death of another.

> Therefore, if in this case you find from the evidence that Trautman at and just prior to the collision of the two automobiles herein involved, was the driver of the defendant's automobile, and that, whether you find that said Trautman was or was not under the influence of intoxicating liquor, but you are convinced beyond a reasonable doubt that he drove said automobile at an excessive rate of speed and in such manner as to endanger the life and limb of any person upon said highway, or that he drove the same upon the wrong side of the said highway at a time and place when and where he was not confronted by any necessity for driving on such wrong side of the highway in order to avoid a sudden emergency, as by me explained in Instruction No. 11, herein, then, in such case, the defendant is guilty equally with the said Trautman of the violation of the law, and if such violation of law was the proximate cause of the death of the persons in the [other] car, the defendant is guilty of involuntary manslaughter, and you should so find by your verdict.

specifically instructed that principals to a robbery are equally responsible for a killing committed in the course of the robbery, irrespective of which participant in the robbery actually committed the killing.[15]

Nor do I find the support the majority perceives in *State v. Butcher*, 137 Idaho 125, 44 P.3d 1180 (Ct. App. 2002). Although I agree with the majority that the rule pronounced by the Court of Appeals in that case is sound, it simply has no application to this case. In *Butcher*, the district court instructed the jury as to the law of principal liability as an aider-and-abettor. This did not happen in this case, as the majority properly recognizes.

For these reasons, I do not subscribe to the majority's view that the sufficiency of the evidence should be judged to determine whether substantial, competent evidence exists to support a finding that Adamcik engaged in conduct that caused Stoddart's death by aiding and abetting Draper in killing Stoddart. Consistent with Justice White's statement in *McCormick*, I believe that the majority's decision usurps the role of the jury and deprives Adamcik of his right to a jury trial, guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 7 of the Idaho Constitution.

Accordingly, I believe that the sole inquiry is that demanded by the district court's instructions: did the State produce sufficient evidence to permit the jury to conclude beyond a reasonable doubt that Adamcik stabbed Stoddart, causing her death?[16] This leads me to Part III.A. of the Court's decision.

---

[15] Instruction No. 20 charged the *Owen* jury as follows:

> All persons concerned in the commission or attempted commission of a robbery, whether they directly commit the act constituting the offense or aid and abet in its commission, are equally guilty of all acts done by any of them in furtherance of the criminal offense.
> If you find from the evidence in this case that the defendants, acting together an in concern and with the common design and purpose, went to the store of Bert McCurry to rob him and in attempting to accomplish such robbery one of the defendants shot and killed the said Bert McCurry with a pistol, then each defendant is equally guilty of said killing, even though such homicide was not the result intended or within the contemplation of the parties as part of their original design.

This charge is consistent with the allegation that Owen and Hastings acted in concert in the killing. The information alleged, in pertinent part, as follows:

> And that the said defendants, William Lawrence Owen and Kenneth Raymond Hastings, did wilfully, unlawfully, knowingly and feloniously aid, encourage, propose, advise, counsel and abet each other in the unlawful commission of said crime.

[16] I have also considered the possibility that the omission of an aiding and abetting instruction was harmless error under the holding in *Neder v. United States*, 527 U.S. 1 (1999). In *Neder*, the Supreme Court stated: "Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id*. at 9 (emphasis original). The court concluded that "where a reviewing court concludes

**Part III.A**

I join in Chief Justice Burdick's dissent, as I do not believe that the State produced sufficient evidence to support a finding that Adamcik personally inflicted the stab wound that killed Stoddart. I would have no hesitation whatsoever in upholding a conviction if the jury had been instructed on a principal theory of criminal liability for aiding and abetting the slaying, However, I do not view myself as being free to weigh the evidence and determine that Adamcik is guilty of Stoddart's murder on a theory not presented to the jury by way of instruction. That determination could only have been made by a properly instructed jury. As jeopardy has attached, the conviction cannot be vacated and the matter remanded for new trial. If my premise is correct that there was insufficient evidence produced at trial to support a finding that Adamcik inflicted a fatal stab wound, this Court can only reverse the conviction. For that reason, I respectfully dissent from the Court's opinion affirming Adamcik's conviction and sentence for first degree murder.

---

beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Id*. at 17.

In my view, this case is not like *Neder*, in which there was an element of the offense which was uncontroverted and unchallenged. To the contrary, the defense focused on the charge which had been made and upon which the jury had been instructed, and argued for an acquittal based upon the absence of evidence that Adamcik directly participated in the killing. In closing argument, Adamcik's attorney stated:

> Some of these instructions can get a little bit confusing, but this is what it says – this is what the State must prove. They have to prove the charge. And look under Count I, Murder in the First Degree, that the said Torey Michael Adamcik, in the County of Bannock, State of Idaho, on or between the 22nd, 23rd days of September, 2006, did willfully, unlawfully, deliberately, and with premeditation, malice – and aforethought, kill and murder Cassie Stoddart, a human being, by purchasing knives and stabbing Cassie Stoddart, from which the victim died in Bannock County, Idaho.
> Did they prove that? Did Dr. Skoumal establish that Torey Adamcik put a knife in Cassie Stoddart? They have to prove that or they have not met their burden.

Defense counsel then returned to the lack of physical evidence to support the charge that Adamcik actually killed Stoddart:

> What happens is you see the videotape and you start assuming stuff. You start assuming that is the end of the story – but it's not. And it's real hard to believe, isn't it, it's hard to believe – that that Cassie is dead – that he didn't do it. But all of the physical evidence proves that he didn't do it.
> There is not one single piece of evidence that ties Torey Adamcik to ever touching Cassie Stoddart. Not one. Not one. Out of all the things they have.

Given the defense focus on the charging language contained in the information, and the absence of evidence to support the charge, I cannot conclude that the omission of an aiding and abetting instruction was harmless.